**In re WORLDCOM, INC. SECURITIES LITIGATION**

**This Document Relates to:**

**All Actions**

**No. 02 Civ. 3288(DLC).**

United States District Court, S.D. New York.

Dec. 15, 2004.

Max W. Berger, John P. Coffey, Steven B. Singer, Chad Johnson, Beata Gocyk–Farber, John C. Browne, Jennifer L. Edlind, David R. Hassel, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant, Barrack, Rodos & Bacine, Philadelphia, PA, for Lead Plaintiff in the *Securities Litigation.*

Jay B. Kasner, Susan L. Saltzstein, Cyrus Amir–Mokri, Steven J. Kolleeny, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, Thomas J. Nolan, Jason D. Russell, Los Angeles, CA, for Underwriter Defendants.

George R. Kramer, Securities Industry Association, Washington, D.C., Marjorie E. Gross, The Bond Market Association, New York, NY, Davis Polk & Wardwell, New York, NY, for amici curiae the Securities Industry Association and The Bond Market Association.

## OPINION AND ORDER

COTE, District Judge.

## TABLE OF CONTENTS

Introduction .................................................. 634

Background.................................................... 635
 Procedural History ...................................... 635
 WorldCom and its Role in the Telecommunications Industry .................... 637
 Ebbers' Dependence on WorldCom Stock .................................... 639
 WorldCom's Accounting Strategies ........................................ 640
 Andersen and the 1999 Form 10–K ........................................ 643
 2000 Offering ........................................................ 645
 Late 2000 Investment Banking Transactions ................................ 649
 The Underwriter Defendants' Credit Assessment of WorldCom as of Early
 2001 .............................................................. 649
 2000 Form 10–K ...................................................... 652
 2001 Offering ........................................................ 652

Discussion ................................................... 655
 I. Legal Framework.................................................. 656
 A. Section 11 ...................................................... 656
 B. Section 12 ...................................................... 659

II. Lead Plaintiff's Motion for Partial Summary Judgment .................... 660
III. The Underwriter Defendants' Motion for Summary Judgment: The
Financial Statements ................................................. 661
 A. Role of the Underwriter ......................................... 662
 B. The "Due Diligence" Defenses ................................... 662
 C. Accountants as Experts ......................................... 664
 D. Integrated Disclosure, Shelf Registration, and Rule 176 .......... 666
 E. Case Law: Reliance Defense ..................................... 671
 F. Case Law: Due Diligence Defense ................................ 674
 G. The Application of the Law to This Motion ........................ 678
 1. Audited Financial Statements ................................ 678
 a. 2000 Registration Statement ............................. 678
 b. 2001 Registration Statement ............................. 680
 i. Goodwill and Asset Impairment ...................... 680
 ii. Ebbers' Personal Finances ......................... 681
 iii. E/R Ratio ....................................... 681
 2. Interim Financial Statements ................................ 681
IV. The Underwriter Defendants' Motion for Summary Judgment:
Omissions ........................................................... 685
 A. 2000 Registration Statement .................................... 685
 1. Sprint Merger ............................................. 687
 2. Conflicts of Interest ....................................... 688
 3. Risk Factors .............................................. 690
 B. 2001 Registration Statement .................................... 692
 1. Downgrading WorldCom as a Credit Risk ..................... 695
 2. Use of Proceeds .......................................... 696
 3. Risk Factors .............................................. 697

Conclusion ............................................................... 697

This Opinion addresses issues related to an underwriter's due diligence obligations. Following the conclusion of fact discovery, several of the parties in this consolidated securities class action arising from the collapse of WorldCom, Inc. ("WorldCom") have filed for summary judgment. This Opinion resolves the motions for summary judgment filed by Lead Plaintiff for the class, who seeks a declaration that certain of the WorldCom financials incorporated in the registration statements for two World-Com bond offerings contained material misstatements; and by the underwriters for those same bond offerings, who seek a declaration that they have no liability for any false statements in the WorldCom financials that accompanied the registration statements or for the alleged omissions from those registration statements.

It is undisputed that at least as of early 2001 WorldCom executives engaged in a secretive scheme to manipulate World-Com's public filings concerning World-Com's financial condition. Because those public filings were incorporated into the registration statements for the two bond offerings, the underwriters are liable for those false statements unless they can show that they were sufficiently diligent in their investigation of WorldCom in connection with the bond offerings. Through these motions, the Lead Plaintiff emphasizes that the underwriters did almost no investigation of WorldCom in connection with their underwriting of the bond offerings for the company, and because they did essentially no investigation, will be unable to succeed with their defense that they were diligent. The Lead Plaintiff contends moreover that there were "red flags" that should have led the underwriters to question even the audited financials filed by WorldCom.

For their part, the underwriters emphasize that WorldCom management con-

cealed the fraud from almost everyone within WorldCom, from WorldCom's outside auditor, and from the underwriters themselves. They assert that they were entitled to rely on WorldCom's audited financial statements as accurately describing the company's financial condition, and also on the comfort letters that WorldCom's outside auditor provided for the unaudited financial statements. While they have not moved for summary judgment on the adequacy of their due diligence efforts *per se,* they do argue that those efforts should not be measured solely by the work that they undertook in connection with the bond offerings themselves, but should be assessed against a background of their long term familiarity and work with the company. They also argue that much of the information that was allegedly omitted from the bond registration statements was already known to the public.

For the following reasons, the Lead Plaintiff's motion is granted in part. The underwriters' motion is also granted in part.

## Background

These summary judgment motions require, in varying amounts of detail, an understanding of the industry in which WorldCom operated, some of the accounting issues that affected the reliability of the WorldCom financial statements, and the due diligence work performed by the underwriters in connection with the two bond offerings. The facts recited here are either undisputed or as shown by the party resisting summary judgment, unless otherwise identified. A brief description of the history of this litigation and the context for the summary judgment motions precedes the factual recitation.

1. Line costs, which are transmission costs, are described below. They were the single

*Procedural History*

WorldCom announced a massive restatement of its financials on June 25, 2002. It reported its intention to restate its financial statements for 2001 and the first quarter of 2002. According to that announcement, "[a]s a result of an internal audit of the company's capital expenditure accounting, it was determined that certain transfers from line cost expenses [1] to capital accounts during this period were not made in accordance with generally accepted accounting principles (GAAP)." The amount of transfers was then estimated to be over $3.8 billion. Without the improper transfers, the company estimated that it would have reported a net loss for 2001 and the first quarter of 2002. On July 21, it filed for bankruptcy. A restatement of WorldCom's financials was issued in 2004 in connection with WorldCom's emergence from bankruptcy. WorldCom restated its financial information for the years ending 2000 and 2001. The restatement included approximately $76 billion in adjustments, which reduced WorldCom's net equity from approximately $50 billion to approximately minus $20 billion.

Securities litigation addressing the accuracy of WorldCom's financial statements commenced in the Spring of 2002. Those class actions filed in this district were consolidated on August 15, 2002. The Judicial Panel on Multi–District Litigation ("MDL Panel") transferred the securities litigation pending in federal courts to this district and all of the actions, both individual ("Individual Actions") and class actions, were consolidated for pre-trial purposes on December 23, 2002. *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2002 WL 31867720 (S.D.N.Y. Dec.23, 2002).

largest operating expense incurred by World-Com.

This litigation is referred to as the *Securities Litigation.*[2]

The consolidated class action complaint in the *Securities Litigation* was filed on October 11, 2003, and the first wave of motions to dismiss that pleading were resolved in an Opinion of May 19, 2003. *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392 (S.D.N.Y.2003). Fact discovery in the *Securities Litigation* concluded on July 9, 2004.[3] Before its conclusion, Citigroup, Inc., Citigroup Global Markets Inc. f/k/a/ Salomon Smith Barney Inc. ("SSB"), Citigroup Global Markets Limited f/k/a/ Salomon Brothers International Limited, and Jack B. Grubman ("Grubman") (collectively "Citigroup Defendants") settled the class action lawsuit. A fairness hearing on the $2.575 billion settlement was held on November 5, 2004, and the settlement was approved. *In re WorldCom Sec. Litig.*, No. 02 Civ. 3288(DLC), 2004 WL 2591402 (S.D.N.Y. Nov.12, 2004).

SSB had functioned was the co-lead underwriter for the two bond offerings issued by WorldCom that are at issue in the class action: one in May 2000 ("2000 Offering") and one in May 2001 ("2001 Offering"). Grubman, an SSB employee, was the leading telecommunications analyst covering WorldCom and it is alleged that he had issued reports urging investors to purchase WorldCom securities when he knew that WorldCom's financial statements did not accurately disclose information that was material to investors. The plaintiffs asserted that SSB's desire to obtain WorldCom's investment banking business caused it to issue misleading analyst reports that urged investors to purchase WorldCom securities. The class action complaint alleged that the Citigroup Defendants violated not just the strict liability statutes governing securities offerings, but also the securities statutes that forbid fraud, including Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)" and "Exchange Act").

The defendants in the class action, as named in a Corrected First Amended Class Action Complaint of December 1, 2003, include former WorldCom executives Bernard J. Ebbers ("Ebbers"), WorldCom's CEO, and Scott Sullivan ("Sullivan"), WorldCom's CFO; members of WorldCom's Board of Directors ("Director Defendants"), investment banks that underwrote the 2000 and 2001 Offerings,[4] and Arthur Andersen LLP ("Andersen"), WorldCom's former auditor. The plaintiffs allege that the Underwriter Defen-

**2.** The MDL Panel also transferred all litigation concerning WorldCom raising issues under the Employment Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, to this district. It has been consolidated and is referred to as the *ERISA Litigation.*

**3.** Fact discovery of the plaintiffs in the Individual Actions remains to be done.

**4.** The underwriters consist of Salomon Smith Barney, Inc., now d/b/a/ Citigroup Global Markets Inc. and Salomon Brothers International Limited (collectively "SSB"); J.P. Morgan Chase & Co., J.P. Morgan Securities, Ltd., & J.P. Morgan Securities, Inc. (collectively "J.P. Morgan"); Banc of America Securities LLC; Chase Securities Inc.; Lehman Brothers Inc., Blaylock & Partners, L.P.; Credit Suisse First Boston Corp.; Deutsche Bank Alex. Brown, Inc., now known as Deutsche Bank Securities, Inc.; Goldman, Sachs & Co.; UBS Warburg LLC; ABN/AMNRO Inc.; Utendahl Capital; Tokyo–Mitsubishi International plc; Westdeutsche Landesbank Girozentrale; BNP Paribas Securities Corp.; Caboto Holding SIM S.p.A.; Fleet Securities Inc.; and Mizuho International plc. Some of the Underwriter Defendants participated in only one of the two Offerings. For purposes of this Opinion, it is unnecessary to distinguish among them. As used in this Opinion, the term "Underwriter Defendants" refers to all underwriters except for SSB.

dants violated Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Section 11", "Section 12(a)(2)", and "Securities Act"), 15 U.S.C. § 77k and § 77l, and that Andersen violated Section 11 of the Securities Act and Section 10b of the Exchange Act.

On August 20, 2004, summary judgment motions were filed by parties to the class action. The trial is scheduled to begin on February 28, 2005.

The Lead Plaintiff has moved for partial summary judgment, and the Underwriter Defendants have moved for complete summary judgment.[5] The Lead Plaintiff moves for summary judgment on its Sections 11 and 12(a)(2) claims with respect to certain statements in WorldCom's financial filings that the Lead Plaintiff contends are indisputably false and material. WorldCom's financial filings were incorporated into the registration statements for the 2000 and 2001 Offerings. The allegedly false statements on which the Lead Plaintiff's motion is based relate to the reporting of WorldCom's line costs, capital expenditures, depreciation and amortization, assets, and goodwill.

The Underwriter Defendants move for summary judgment on the Sections 11 and 12(a)(2) claims against them with the argument that it is undisputed that they conducted reasonable due diligence with respect to the WorldCom financial statements that were incorporated into the registration statements for the 2000 and 2001 Offerings. They argue in particular that they were entitled to rely on WorldCom's audited financial statements and had no duty to investigate their reliability unless they had reasonable grounds to believe

that they were not accurate, and that they were also entitled to rely on the "comfort letters" from WorldCom's auditor for the interim unaudited WorldCom financial statements. With respect to the alleged material omissions that are also a basis for those same Securities Act claims, the Underwriter Defendants contend that none of the omissions are actionable, for instance, because the information was already publicly disclosed or was not material.

The parties have made extensive submissions in connection with these competing motions. Because of the analysis which follows, it is only essential to set forth a small portion of the factual material presented through these motions. The essential facts as shown through the evidence presented with these motions include the following.

*WorldCom and its Role in the Telecommunications Industry*

Ebbers founded a long-distance telephone service provider in 1983 in Mississippi. His company grew by purchasing other small long-distance companies throughout the late 1980s and early 1990s. The company went public in 1989, and by 1993 it was the fourth largest long-distance carrier in the United States. It took the name WorldCom in 1995.

Congress enacted the Telecommunications Act in 1996, 47 U.S.C. § 251 *et seq.*, which encouraged competition in local and long-distance telephone services. At this same time, the Internet was expanding rapidly and there was a demand for in-

---

**5.** With one exception, all of the material misstatements in the 2000 and 2001 offerings outlined by Lead Plaintiff in its responses to the Underwriter Defendants' second set of interrogatories are grounded in WorldCom's financial statements. The sole exception relates to statements in the May 2001 Registra-

tion Statement as to how proceeds from the offering would be used. This alleged misstatement is similar to an alleged omission in the registration statement, and the Underwriter Defendants have presented arguments in their briefs that address either characterization.

creased bandwidth.[6] To meet that demand and in response to the intense competition, telecommunications companies made substantial capital investments in fiber optic networks and telecommunications infrastructure.

Between 1996 and 1999, WorldCom completed several major acquisitions that helped diversify or enlarge its business. Through a merger with MFS Communications, Inc., WorldCom acquired UUNET Technologies Inc., which was the world's largest Internet service provider and which had a substantial fiber optic cable network. It acquired CompuServe Corporation and ANS Communications Inc., which gave WorldCom a large Internet dial-up communications network. The acquisition of SkyTel Communications, Inc. gave WorldCom an expertise in the wireless business. In 1998, WorldCom acquired MCI Communications ("MCI"), a company whose revenues were more than two and half times greater than WorldCom's. With that acquisition WorldCom became the second largest telecommunications company in the world. Its share price, which had been approximately $8 per share in 1994, increased to $48 per share by September 1999.

As noted, by the late 1990s, the telecommunications industry was growing increasingly competitive. Regional companies were entering the long-distance market, long-distance carriers were entering the local call market, and many companies were seeking to provide Internet services. Some analysts expressed concerns about WorldCom's weakness in wireless technologies and the increased competition it faced in the long-distance telephone service market, where competition was driving prices down.

On October 5, 1999, WorldCom announced that it had agreed to merge with Sprint in a transaction valued at $129 billion. With this acquisition, WorldCom would get Sprint's wireless business and address some of the concerns expressed about its competitive posture in the telecommunications market. The market initially reacted enthusiastically to the announcement, but as time passed WorldCom's share price fell dramatically. On May 18, 2000, attorneys in the Antitrust Division of the United States Department of Justice formally recommended to their division chief that the merger be blocked. On July 13, WorldCom announced that it was terminating its merger agreement with Sprint. By the end of August 2000, WorldCom's stock was trading in the low $30s.

On September 5, 2000, WorldCom announced that it had entered into a $6 billion merger agreement with Intermedia. Intermedia had a local exchange carrier business and owned a web hosting business, Digex. WorldCom hoped to sell the local carrier business and to take advantage of the Digex Internet business. With the acquisition of Intermedia, WorldCom assumed massive debt obligations. WorldCom paid approximately $250 million a quarter to fund Intermedia's business and approximately $300 million a year to support Digex's capital expenditure needs. WorldCom was unable to find a buyer for the Intermedia local carrier business.

On November 1, 2000, WorldCom announced that its revenues for 2001 would not be as high as previously estimated. WorldCom indicated it was issuing "new financial guidance due to continuing competitive pressures in the telecommunica-

---

**6.** Bandwidth is used to mean the rate of data transmission and refers to the maximum amount of information that can be sent along a particular communications circuit per second.

tions industry, increased spending to support the Company's growth initiatives and other economic factors."

*Ebbers' Dependence on WorldCom Stock*

Ebbers' personal finances were dependent on the rise and fall of WorldCom's stock price. The majority of his wealth was concentrated in his holdings of WorldCom stock. He pledged essentially all of his WorldCom stock to secure loans that he used to acquire other businesses and to fund their operations. Most of his personal debt was held by affiliates of Citibank and Bank of America.

As described above, WorldCom's stock price fell during 2000. By the Fall of 2000, Ebbers began receiving substantial margin calls from Bank of America's private bank. Because Ebbers had already pledged all of his holdings to secure his personal debt, he was unable to pledge any additional stock. On September 6, WorldCom agreed to extend Ebbers a $50 million loan to cover the margin calls. Within a few weeks, Ebbers faced additional margin calls. When WorldCom refused a request for an additional loan, Ebbers entered into a forward sale of three million WorldCom shares to raise $70 million. The sale was reported by the media on October 4, and WorldCom's stock price dropped nearly 8%, to $24.93.

In early October 2000, Citibank issued margin calls to Ebbers. Its affiliate SSB had a significant investment banking relationship with WorldCom, and SSB agreed to guarantee payment of Ebbers' personal debt to Citibank.[7]

On October 27, WorldCom agreed to loan Ebbers an additional $25 million and to guarantee an additional $75 million of Ebbers' debt to Bank of America, staving off additional margin calls. In mid-November, the guarantee was increased to $100 million. By the end of 2000, WorldCom had extended a total of $200 million in loans and guarantees to Ebbers. The loans increased to over $250 million by May 2001.

On April 11, 2001, Ebbers met with the private banking arm of J.P. Morgan and requested a loan of $40 million to refinance $20 million of his debt to Bank of America relating to his investment in a yacht building business, and to invest another $20 million in building additional yachts. The investment bankers encouraged their bank to accommodate Ebbers, and in June, J.P. Morgan gave Ebbers a personal line of credit of $20 million. An April 26 memorandum analyzing Ebbers' personal financial situation noted that "Ebbers has used his wealth in WCOM to fund his investments," principally in a yacht building business, timber, motels, a trucking company and the largest working ranch in North America. The memorandum continued,

> Unusual for a CEO of this type, he has virtually no other marketable securities.... To finance these private investments, Ebbers has accumulated substantial margin loans against his WCOM shares. Last fall, when the share price of WCOM declined substantially, his

---

7. A November 21, 2000 SSB memorandum explains that the SSB private banking group held approximately $50 million of margin loans to Ebbers and certain of his companies which were secured by WorldCom stock. At the then current price of WorldCom stock, this gave Citigroup an unsecured exposure of $5 million. The memorandum explained, "[o]n the strength of the corporate finance relationship between SSB and [WorldCom], SSB effectively guaranteed the Private Bank's exposure, and has elected not to enforce the margin call provisions or the demand feature of our loan documents. We are, however, in the process of taking liens on the client's vacation condo and his yacht which reportedly have aggregate value sufficient to cover our clean exposure."

largest lender, Bank of America, issued some well-publicized margin calls. In order to forestall a sale of the Chairman's shares and risk further downward pressure on the share price[,] WCOM stepped in and replaced Bank of America as lender on $75 million and provided an additional guaranty on the remaining $186 million loans outstanding.... While Bank of America seems comfortable for the moment, the current margin structure of his debt and the illiquid nature of his other assets *provides little room for movement in the WCOM share price.*

(Emphasis supplied.) The memorandum added that Ebbers had a "highly leveraged balance sheet with $315 million in debt structured as margin loans against his [WorldCom] shares. 80% leverage against WCOM shares."

## WorldCom's Accounting Strategies

WorldCom's single largest operating expense was its line costs. This item accounted for roughly half of its expenses and was so material that it was reported as a separate line item on its financial statements. WorldCom's ratio of line cost expense to its revenue was called the E/R ratio, was used as a measurement of its performance, and was also publicly reported in its SEC filings. The lower the ratio, the better the performance.

The parties dispute the extent to which WorldCom's financial statements were intentionally and materially false before the first quarter of 2001. They do not dispute, however, that senior management in WorldCom manipulated the public reports of WorldCom's line costs beginning in the first quarter of 2001 through shifting a portion of them to capital expenditures accounts, and that this manipulation was criminal.[8] The manipulation reduced the reported line costs and resulted in a lower E/R ratio.

Before capitalizing the line costs in 2001, WorldCom had engaged in other strategies to reduce the apparent magnitude of its line costs. One example will suffice. During 2000, WorldCom released reserves or accruals that had been set aside to cover anticipated costs, and used them to offset line costs. These reserves had been maintained to cover additional bills that WorldCom had estimated it might receive from outside service providers.[9] By releasing these reserves, line costs appeared smaller. Prior to 2000, WorldCom had a 24–month billing reserve for invoices it had not yet received. This reserve covered its estimated exposure for a rolling 24–month period. In the first quarter of 2000, WorldCom management decided to reduce the period of time covered by the reserve from 24 to twelve months. WorldCom divided the impact from this change in policy between the first and second quarters of

---

8. On July 9, 2004, the Underwriter Defendants refused, when responding to the Lead Plaintiff's Requests for Admission, to admit that any of WorldCom's financial disclosures contained misstatements. The Underwriter Defendants maintained this position during a telephone conference with the Court and other parties on August 18, 2004, noting that Andersen had taken an identical stance. Two days later, however, the Underwriter Defendants filed their motion for summary judgment, in which they represent that they are reviewing their responses to Lead Plaintiff's

Requests for Admission "to determine the extent to which amendment of any denial is required by the fact that WorldCom improperly accounted for $771 million in line costs in the first quarter of 2001."

9. A reserve was created when WorldCom received a bill that was smaller than the bill it had estimated it would receive. The statute of limitations on submitting a corrected bill, or "backbilling," was understood to be 24 months.

2000: $59 million was released in the first quarter; $77 million was released in the second quarter. In the last quarter of 2000, WorldCom reduced the period from twelve months to 90 days and released $70 million in reserves in that quarter.

Unable to reduce reserves further, and still wishing to conceal the magnitude of WorldCom's expenses and artificially inflate WorldCom's reported income, senior management of WorldCom started in 2001 to capitalize WorldCom's line costs. They would review WorldCom's financial results toward the end of each quarter in order to decide how much of the line cost expenses to capitalize. The capitalization of line costs was unsupported by any contemporaneous analysis or records, and was a violation of GAAP. It is undisputed that it constituted fraud.

The capitalization fraud began on Friday, April 20, 2001, when Troy Normand, WorldCom's Director of Legal Entity Reporting in General Accounting, directed that line costs be reduced by $771 million by booking that amount of line costs in an entry labeled "prepaid capacity." Between that day and Tuesday, April 24, WorldCom personnel allocated the line costs expenses to WorldCom's two tracker stocks [10] and other business units. This manipulation was necessary to make the E/R ratio for the first quarter of 2001 "fairly consistent" with the E/R ratio for the prior quarter.

Andersen was unaware of the manipulation of line costs through this capitalization scheme. On April 26, WorldCom issued a Form 8-K.[11] That Form 8-K falsely represented WorldCom's financial condition.

The Lead Plaintiff contends that two WorldCom documents from March and April 2001, if reviewed, would have revealed the discrepancy between WorldCom's actual financial condition and its public reports.[12] A March 20, 2001 document, which is labeled "2001 Line Cost Budget/Final Pass/Corporate Financial Planning," reveals that WorldCom internally projected line costs to be materially higher than what it was reporting for line costs in 2001. The document projects line costs for the first quarter at $4.65 billion. On April 26, 2001, it publicly reported in its Form 8-K first quarter line costs of only $4.1 billion, or half a billion dollars less.

The 2001 Line Cost Budget document also showed that WorldCom expected an E/R ratio of 47.6% for 2001, based on $19.2 billion of line costs on $40.3 billion of revenue. WorldCom had reported an E/R ratio of 39.6% in 2000. The document attributes the difference to several factors, including the fact that WorldCom could no longer release line cost reserves.[13] The

---

**10.** On November 1, 2000, WorldCom announced a plan to separate its businesses and create two publicly traded tracking stocks: WorldCom, which would reflect the performance of WorldCom's "core high-growth data," Internet, hosting and international businesses; and MCI, which would reflect the performance of its high cash flow consumer, small business, wholesale long-distance voice and dial-up Internet access operations.

**11.** A Form 8-K is the SEC form used for companies' current reports pursuant to Sections 13 and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a)(2), 78o(d). A Form 8-K

must be filed upon the occurrence of certain significant corporate events as defined by the SEC and may be filed with respect to any other matter the company considers of material importance.

**12.** The Underwriter Defendants argue that these documents have never been authenticated.

**13.** The 2001 Line Cost Budget reads in this connection: "YOY change in *E/R largely impacted by:* Increase in submitted E/R in domestic voice/data: ... *Depletion of reserve liabilities ....*" (emphasis supplied).

document cryptically lists dollar values as "tasks" and computes the effect of the "task" on WorldCom's E/R ratio. For instance, a "Task of $100M improves E/R to 40.7%." Overall, the document reflects a "proposed 2001 task" in the amount of $471 million.

WorldCom's Capital Expenditure Report, prepared on a monthly and quarterly basis by its Financial Planning Department, described its capital expenditures. The March 2001 Capital Expenditure Report was distributed on April 20, 2001. It reported that WorldCom's capital expenditures (excluding software) were $1.691 billion for the first quarter. On April 26, however, WorldCom's Form 8–K publicly reported that the first quarter capital expenditures were $544 million more or $2.235 billion.[14]

The significance of the Capital Expenditure Report was self-evident. On May 1, 2002, after the March 2002 report was distributed, one co-conspirator e-mailed a colleague: "Where do I sign my confession?" Another complained, "Why did you distribute this report? I thought we were never again distributing this.... No need to reply but do not distribute again."

The improper capitalization of line costs continued through the first quarter of 2002. WorldCom's internal audit department had completed its last audit of WorldCom's capital expenditures in approximately January of 2002, and had not uncovered any evidence of fraud. In May of 2002, it began another audit of the company's capital expenditures. The fraudulent capitalization of line cases was uncovered as a result of a May 21 meeting between the company's internal auditors and the WorldCom director in charge of tracking capital expenditures. During that meeting the director used the term "prepaid capacity" to explain the difference between two sets of schedules that he was being shown. The auditors were unfamiliar with the term. After asking questions of several people about "prepaid capacity," Eugene Morse, a member of WorldCom's internal audit group, used a new software tool to investigate WorldCom's books and was able to uncover the transfer of line costs to capital accounts in a matter of hours.[15]

On June 17, David Myers, WorldCom's former controller, admitted to the internal audit team that there was "no support" for the prepaid capacity entries and that there was "no standard" supporting the entries. He explained that the "entries had been booked based on what they thought the margins should be." Myers told the team, "if we couldn't get the costs down that we might as well shut the doors of the business, that we can't continue." On June 20, during a meeting in which Sullivan was confronted with the fraud, Myers told internal audit that the capitalization of line costs had started in the first quarter of 2001. As of that time, the internal audit

---

14. The Underwriter Defendants contend that the Lead Plaintiff has focused on the wrong page of the document and should focus on the last page "which shows actual capital expenditures of less than what WorldCom actually reported." It is the Lead Plaintiff's contention, however, that the Capital Expenditure Report does in fact reflect "actual capital expenditures of less than what WorldCom actually reported." It would appear, therefore, that the parties are reading the document in a similar way.

15. Morse testified that without that software tool and without access to the general ledger (which the internal audit department did not have), it would have taken him weeks of digging to uncover the fraud. In his opinion, someone with access to the general ledger or someone who asked those who made the questionable entries for the documentation to support the entries, could also have uncovered the fraud.

team thought that the capitalization of line costs had begun in the second quarter of 2001, and was no longer trying to find out how far back the entries went.

*Andersen and the 1999 Form 10–K* [16]

Andersen had been the auditor for WorldCom or its predecessors for almost twenty years. It issued an unqualified or "clean" opinion for the WorldCom annual financial statements for 1997 through 2000 [17] After the public disclosure of the accounting fraud, Andersen withdrew its support for the WorldCom 2001 Form 10–K, but it never withdrew its audit opinions for the 1999 or 2000 Form 10–Ks.

The WorldCom 1999 Form 10–K, for the year ending December 31, 1999, was dated March 30, 2000. It included detailed discussions of a number of the items that are central to the parties' motions for summary judgment. Its description of the business of WorldCom included the following: "MCI WorldCom leverages its facilities-based networks to focus on data and the Internet. MCI WorldCom provides the building blocks or foundation for the new e-economy.... MCI WorldCom provides the broadest range of Internet and traditional, private networking services available from any provider." The 10–K described nine mergers since 1995. In describing the merger agreement with Sprint, it defined its strategy as an effort

to further develop as a fully integrated telecommunications company positioned to take advantage of growth opportunities in global telecommunications. Consistent with this strategy, the Company

believes that transactions such as the MCI Merger, the CompuServe Merger, the AOL Transaction, the SkyTel Merger and, if consummated, the Sprint Merger, enhance the combined entity's opportunities for future growth, create a stronger competitor in the changing telecommunications industry and allow provision of end-to-end bundled services over global networks, which will provide new or enhanced capabilities for the Company's residential and business customers. In particular, the Company believes that if consummated, the Sprint Merger will enable the combined company to: (i) offer a unique broadband access alternative to both cable and traditional telephony providers in the United States through a combination of digital subscriber line ("DSL") facilities and fixed wireless access using the combined company's "wireless cable" spectrum; (ii) continue to lead the industry with innovative service offerings for consumer and business customers; and (iii) continue as an effective competitor in the wireless market in the United States.

In a section labeled "transmission facilities," the 1999 Form 10–K explains that it owns long-distance, international and multi-city local service fiber optic networks with access to additional fiber optic networks through lease agreements with other carriers. It also owns and leases transoceanic cable capacity. WorldCom uses what it calls "ring topology." The network backbones for this system are installed in conduits owned by WorldCom or leased from third parties. The lease arrange-

---

**16.** A Form 10–K is an SEC form used to file a company's annual report pursuant to Sections 13(a)(2) and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a)(2), 78o(d).

**17.** "An unqualified opinion, the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial

position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *United States v. Arthur Young & Co.,* 465 U.S. 805, 818 n. 13, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

ments "are generally executed under multi-year terms with renewal options and are non-exclusive." To serve its customers in buildings that are not located directly on the fiber network described in the Form 10–K, WorldCom leases lines from local exchange carriers and others.

The 1999 Form 10–K described World-Com's ability to generate profits as depending in part "upon its ability to optimize the different types of transmission facilities used to provide communications services." While the Company's own networks were "typically" the most effective transmission routes, "a variety of lease agreements for fixed and variable cost (usage sensitive) services" ensured "diversity and quality of service." The "rapid and significant" changes in technology were also discussed.

In describing rates and charges, the Form 10–K explained that its rates "are generally designed to be competitive." It reported that to date, "continued improvement in the domestic and international cost structures" had allowed the Company to maintain "acceptable margins."

The topics of competition and regulation were discussed at length. WorldCom represented that it expected that competition, which was already extreme, would "intensify in the future." After discussing different business competitors, the 1999 Form 10–K reported that "WorldCom may also be subject to additional competition due to the development of new technologies and increased availability of domestic and international transmission capacity." It noted that the desirability of its fiber optic network could be adversely affected by changing technology, and that it could not predict which of many future product options would be important. It noted that the Telecommunications Act of 1996 had removed barriers to competition. Once the Bell operating companies were allowed

to offer long-distance services, they would be in a position "to offer single source local and long-distance service similar to that being offered" by WorldCom. It predicted that the increased competition would result in increased pricing and margin pressures. As for its data communications services, including Internet access, that was also extremely competitive. "The success of MCI WorldCom will depend heavily upon its ability to provide high quality data communications services, including Internet connectivity and value-added Internet services at competitive prices."

In its lengthy description of the regulatory environment, the 1999 Form 10–K noted that access charges are a principal WorldCom expense. WorldCom was attempting to bring access charges down to cost-based levels.

Voice revenues for 1999 were described as having increased by 6% over the prior year because of a 10% gain in traffic. "These volume and revenue gains were offset partially by anticipated year-over-year declines in carrier wholesale traffic as well as federally mandated access charge reductions that were passed through to the consumer."

Line costs "as a percentage of revenues" for 1999 were reported to be 43% as compared to 47% for 1998. "Overall decreases are attributable to changes in the product mix and synergies and economies of scale resulting from network efficiencies achieved from the continued assimilation of MCI," and other companies into the Company's operations.

Additionally, access charge reductions that occurred in January 1999 and July 1999 reduced total line cost expense by approximately $363 million for 1999. While access charge reductions were primarily passed through to customers, line costs as a percentage of revenues

were positively affected by over half a percentage point for 1999.

The report explained that the "principal components of line costs are access charges and transport charges." It added that WorldCom's "goal is to manage transport costs through effective utilization of its network, favorable contracts with carriers and network efficiencies made possible as a result of expansion of the Company's customer base by acquisitions and internal growth."

WorldCom's total debt was reported to be $18.1 billion. It had available liquidity of $8.7 billion under its credit facilities and commercial paper program and from cash. Its aggregate credit facilities were $10.75 billion.

WorldCom represented that the development of its business "will continue to require significant capital expenditures." Failure to have access to sufficient funds for capital expenditures on acceptable terms or other difficulties in managing capital expenditures "could have a material adverse effect on the success" of World-Com.

Andersen consented to the inclusion of its March 24, 2000 audit report in the Form 10–K. In that report, Andersen represented that it had audited WorldCom's balance sheets, and statements of operations, shareholders' investment and cash flows. It reported that

> [w]e conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable as-surance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit ... provide[s] a reasonable basis for our opinion.
>
> In our opinion, based on our audit ..., the financial statements referred to above present fairly, in all material respects, the financial position of MCI WorldCom, Inc. and subsidiaries as of December 31, 1999 ..., in conformity with accounting principles generally accepted in the United States.

*2000 Offering*

On May 24, 2000, WorldCom conducted a public offering of debt securities by issuing approximately $5 billion worth of bonds ("2000 Offering"). It filed a registration statement dated April 12, 2000, and prospectus supplement dated May 19, 2000 (collectively "2000 Registration Statement") that incorporated by reference among other things the WorldCom Form 10–K for the year ending December 31, 1999, and its Form 10–Q[18] for the quarter ended March 31, 2000. SSB was the book runner and, with J.P. Morgan, was the co-lead manager.[19]

The April 12, 2000 Registration Statement[20] began with a warning that

---

**18.** A Form 10–Q is the SEC form used for quarterly reports under Sections 13(a)(2) and 15(d) of the Exchange Act, 15 U.S.C §§ 78m(a)(2), 78o(d).

**19.** A book runner is responsible for pricing the offering and allocating shares to institutional and retail investors. A lead manager determines the amount of shares reserved for its own sales efforts and the amount of the offering for other members of the syndicate.

**20.** As described below, a registration statement is composed of two documents: a prospectus, and other information the SEC regulations require an issuer to disclose.

[w]e have not authorized anyone to give any information or to make any representations concerning the offering of the debt securities except that which is in this prospectus or in the prospectus supplement. . . . You should rely only on the information contained in or incorporated by reference into this prospectus.

The document then explained that it was part of a registration statement that was filed with the SEC using a " 'shelf' registration process."

Under this process, we may sell any combination of the debt securities described in this prospectus in one or more offerings up to a total dollar amount of $15,000,000,000. This prospectus provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus.

In describing recent developments, the 2000 Registration Statement focused exclusively on the merger agreement with Sprint. It warned that consummation of the merger was subject to various conditions, including regulatory approval.

In describing how the proceeds would be used from the sale of debt securities, it represented that the proceeds would be used "for general corporate purposes. These may include, but are not limited to, the repayment of indebtedness, acquisitions, additions to working capital, and capital expenditures."

The 2000 Registration Statement included a section labeled "experts." It explained that the year-end WorldCom consolidated financial statements

have been audited by Arthur Andersen LLP, independent public accountants, as indicated in their report with respect

thereto, and are included in the MCI WorldCom's Annual Report on Form 10-K for the year ended December 31, 1999, and are incorporated herein by reference, in reliance upon the authority of such firm as experts in accounting and auditing in giving such reports.

Among the "undertakings" contained in the 2000 Registration Statement was the obligation to file during the period in which sales were being made, a post-effective amendment to "reflect in the prospectus any facts or event arising after the effective date of this registration statement (or the most recent post-effective amendment hereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this registration statement."

The May 19, 2000 Prospectus Supplement explained that the net proceeds from the $5 billion offering would be used to "repay commercial paper, which was issued for general corporate purposes." It announced that following that repayment, WorldCom expected "to incur additional indebtedness. . . ." The document briefly explained WorldCom's business. The bulk of the document addressed the proposed Sprint merger, described Sprint, and presented an unaudited pro forma condensed combined financial statement for the merged entity. It warned that "the merger is subject to the receipt of consents and approvals from various government entities, which may jeopardize or delay completion of the merger or reduce the anticipated benefits of the merger."

The document also included the following explanation of the relationship between the Underwriter Defendants and WorldCom:

The underwriters and their affiliates have performed certain investment banking and advisory and general fi-

nancing and banking services for us from time to time for which they have received customary fees and expenses. The underwriters and their affiliates may, from time to time, be customers of, engage in transactions with and perform services for us in the ordinary course of their business. Salomon Smith Barney Inc. has acted as financial advisor to WorldCom in connection with the Sprint merger, for which it has received certain fees and for which it expects to receive additional fees upon the closing of the Sprint merger. In addition, Salomon Smith Barney will receive a financial advisory fee in connection with this offering.

Each of the Underwriter Defendants involved in the 2000 Offering has stated that it relied on the due diligence performed by SSB. Many of the Underwriter Defendants had underwritten prior WorldCom offerings or had other dealings with WorldCom prior to the 2000 Offering. For example, J.P. Morgan was involved in an offering of WorldCom securities in 1998 and participated in syndicating credit extended to WorldCom that same year. Bank of America had a web of relationships with WorldCom and considered itself the "leading capital provider" to WorldCom since 1990. Among other things, it participated

in the securitization of WorldCom's accounts receivable and a private placement for WorldCom in the 1990s, participated in an April 1998 bond offering by WorldCom, and was a lead manager of the WorldCom acquisition of MCI in 1998.

The prospectus supplement for the 2000 Offering did not include a section labeled "risk factors." Several weeks earlier, on April 30, an investment banker at SSB sent a draft prospectus supplement to a more senior SSB banker with a detailed list of risk factors included in it. Under the heading "Risk Factors," the draft itemized risk factors relating to the Sprint merger, WorldCom's business, and competition in the telecommunications industry, among other things.[21] At the request of WorldCom, the risk factors section was removed.[22]

The only written record of due diligence performed by the Underwriter Defendants for the 2000 Offering is a May 26 memorandum prepared by Cravath, Swaine & Moore ("Cravath"), counsel to the Underwriter Defendants. The memorandum reflects due diligence conducted from May 15 to 23.[23] It describes a May 17 telephone conversation in which Sullivan was asked questions about the Sprint merger, whether WorldCom had experienced prob-

---

**21.** The draft document noted, for instance, that the development of the business of WorldCom required "significant capital expenditures" and that it planned to "access" the debt market to meet its needs to the extent that its cash flow, credit facilities, and commercial paper program were insufficient. It warned that the "effect of technological changes, including changes relating to emerging wireline and wireless transmission and switching technologies, on the businesses of MCI WorldCom cannot be predicted." It described legislation and court rulings that were affecting its business. On the issue of competition, the draft document noted over the course of a several page detailed discussion that WorldCom expected that competition

would intensify, including competition "due to the development of new technologies."

**22.** WorldCom explained that it "no longer disclose[d]" risk factors related to the business of WorldCom in its SEC filings. Insofar as the regulatory environment was concerned, it noted that it updated its regulatory information each quarter in its "34 Act filings." WorldCom did, however, want to consider whether risks associated with the Sprint merger should be included.

**23.** The memorandum indicated that due diligence for WorldCom for the period prior to August 17, 1999 was contained in a document of that date.

lems integrating either SkyTel or MCI, and whether there were any other material issues.[24] In that conversation, Sullivan predicted overall growth for the year 2000 would be about 14%, represented that the proceeds for the 2000 Offering would be used to repay "commercial debt," reported that WorldCom was experiencing a very competitive environment but that there were no changes in that environment since 1999, and stated that there were no other material issues than the ones he described in the call. The memorandum then outlines the board minutes for WorldCom, lists its public filings, refers to its press releases, and discusses Sprint documents.

J.P. Morgan's 1998 Overview of the Debt Underwriting Process was still in effect in 2000 and contained the following descriptions of an underwriter's responsibility.

In our role as an underwriter or distributor of securities, performance by J.P. Morgan entities of an appropriate due diligence investigation of the issuer serves a variety of important purposes. The most obvious key advantage of proper due diligence is protection against unexpected news regarding the issuer or its business having an adverse effect of the pricing and/or placement of the offered securities during the primary distribution and in the immediate aftermarket.

From a legal perspective, under the securities laws of the U.S. and several other jurisdictions, due diligence creates an affirmative defense to underwriter/distributor liability for misstatements or omissions of material facts in offering documents. In practical terms, this means that if the market value of the offered securities declines weeks, months or years after closing and unhappy investors sue the issuer and the underwriters, on the theory that the underlying reason for such market decline should have been disclosed in the offering document, then *J.P. Morgan should be able to avoid an expensive adverse judgment, so long as we can demonstrate that we conducted an appropriate due diligence investigation of the issuer* and its business in connection with the offering. . . .

At least as importantly, due diligence reduces the possibility of commercial and reputational losses arising out of such misstatements and provides us with an opportunity to demonstrate to the issuer client our professionalism, our understanding of its business and our commitment to the transaction.

*In order to successfully establish a due diligence defense, underwriters and securities distributors may not take at face value representations made to them by the issuer and its representatives, but rather must demonstrate they made a reasonable investigation of the facts to ensure there is no misstatement or omission of a material fact in the offering documents* . . . .

*Generally such investigation will focus on discussions with and information provided by the issuer and its counsel and accountants*, although it may be appropriate, in the case of some issuers and industries, to include meetings with outsiders, such as consultants with industry expertise, major suppliers or dominant customers.

(Emphasis supplied.)

Andersen created an undated worksheet in connection with WorldCom's first quar-

---

**24.** The memorandum does not identify who participated in the conversation with Sullivan.

ter 2000 unaudited financial statement. The worksheet was an eleven-page Andersen form entitled "U.S. GAAS Review of Interim Financial Statements of a Public Company," and was a vital step in preparing a "comfort letter" for a company and underwriters. The form reflects tasks to be performed, with boxes to indicate whether the task had been "done" or was "N/A." Most of the tasks had one of those two boxes checked, some had both boxes checked, and one task—reading the financial statements and disclosures in the client's draft Form 10–Q—was left blank. Brief comments were handwritten next to some of the tasks. The form paragraph that appears directly above the engagement partner's signature, states: "Based on the results of the review procedures, we are not aware of any material modifications that should be made to the interim financial statements for them to be in conformity with generally accepted accounting principles consistently applied."

A "comfort letter" for the first quarter 2000 unaudited financial statement is dated May 19, is eight pages long, and indicates that it is written at the request of WorldCom. In it, Andersen reaffirms its audits, including those incorporated in the 2000 Registration Statement. It warns that having not audited any financial statements for any period subsequent to December 31, 1999, it is unable to express any opinion on the unaudited consolidated balance sheet of WorldCom as of March 31, 2000, or the results of operations or cash flows as of any date subsequent to December 31, 1999. The letter indicates, however, that Andersen had performed the procedures specified by the American Institute of Certified Public Accountants for a review of interim financial information as described in SAS No. 71 on the unaudited condensed consolidated balance sheet as of March 31, 2000, and related statements, and had made certain inquiries of World-

Com officials who have responsibility for financial and accounting matters. Andersen represented that nothing had come to its attention as a result of that work that caused Andersen to believe that "[a]ny material modifications should be made to the unaudited condensed consolidated financial statements [for the first quarter of 2000], incorporated by reference in the Registration Statement, for them to be in conformity with generally accepted accounting principles" or that "[t]he unaudited condensed consolidated financial statements ... do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related published rules and regulations." The letter concludes that it is offered to "assist the underwriters in conducting and documenting their investigation" of the affairs of WorldCom in connection with the offering of securities covered by the 2000 Registration Statement. A two page May 23 Andersen letter reaffirmed the May 19 letter.

*Late 2000 Investment' Banking Transactions*

As already described, in November 2000, WorldCom announced that it would be creating two tracking stocks. J.P. Morgan and SSB were involved in this project.

On December 14, 2000, WorldCom conducted a $2 billion private placement of debt. J.P. Morgan was the lead manager and sole book runner for that private placement.

*The Underwriter Defendants' Credit Assessment of WorldCom as of Early 2001*

In February 2001, several of the Underwriter Defendants downgraded WorldCom's credit rating due to their assessment of WorldCom's deteriorating financial condition. Then, during the weeks that followed, several of the Underwriter Defendants made a commit-

ment to WorldCom to help it restructure its massive credit facility. In doing so, there is evidence that at least some of the Underwriter Defendants internally expressed concern again about World-Com's financial health. WorldCom had required the banks to participate in the restructuring of the credit facility if a bank wished to play a significant role in its next bond offering, the 2001 Offering. That offering turned out to be the largest public debt offering in American history. The Lead Plaintiff contends that the evidence of the Underwriter Defendants' concerns about WorldCom's financial condition in the months immediately preceding the 2001 Offering undercuts their contention that the due diligence that they performed in connection with the 2001 Offering was reasonable.

As noted, several of the Underwriter Defendants downgraded WorldCom as a credit risk in February 2001. At the same time, one of the major credit rating agencies publicly announced that it was downgrading long-term WorldCom debt.

On February 22, Bank of America downgraded WorldCom's credit rating from 3 to 4, citing its lack of revenue growth, margin deterioration, the likelihood that WorldCom revenue from its long-distance business would continue to decline, the increasing competitive landscape, WorldCom's increasing debt load, and concerns regarding its strategic direction following the failure of the merger with Sprint.

On February 27, a J.P. Morgan document reflects that the bank reduced its internal "senior unsecured" risk rating for WorldCom from A2 to BBB1 because of WorldCom's "weakened credit profile and continued pressure on its MCI long-distance business segment."[25] The internal report noted that WorldCom's cash flow had moved from a positive to a "Cash Burn" of negative $137 million. It also emphasized WorldCom's high ratio of debt. The report observed that "[i]t remains to be seen if WCOM can stabilize cash flows and increase profitability in its MCI segment while supporting the capital requirements for the high growth data business in an increasingly competitive environment."[26]

On February 27, Standard & Poor's ("S & P") also downgraded WorldCom's credit rating, albeit just its ratings on World-Com's long-term debt instruments. Those were downgraded from a rating of A- to BBB+. S & P simultaneously removed WorldCom from its previously imposed "creditwatch." S & P did not revise its ratings for WorldCom's short-term debt. S & P explained that the downgrade reflected WorldCom's "heightened business risk profile" because of competitive challenges and pricing pressures in the voice and data markets. It observed that the risk was "somewhat offset by the company's financial flexibility and experienced management." It described the outlook for WorldCom as "stable."

In late February, Deutsche Bank downgraded WorldCom as part of a global credit review because of price declines in the long-distance market and WorldCom's need to generate cash. The credit review listed WorldCom's credit status as "[p]erformance concerns" and the bank's credit strategy and risk appetite as "[r]isk appetite reduced."

---

**25.** By February 21, 2001, a J.P. Morgan banker described the burden of carrying the debt associated with the Intermedia business as "a serious risk factor" for WorldCom.

**26.** The Underwriter Defendants contend that at this point in time the author no longer had the responsibility for assigning a credit rating to WorldCom.

Within weeks of these decisions to downgrade WorldCom's credit rating, the Underwriter Defendants had to consider whether to participate in WorldCom's restructuring of its credit facility, which was a line of credit extended to WorldCom by several of the banks, and whether to compete for investment banking positions in the bond offering that WorldCom hoped to undertake that Spring. WorldCom had a $10.25 billion credit facility with affiliates of some of the banks and it wanted to restructure that facility in a $8 to 10 billion transaction. WorldCom informed banks that they could only participate as an underwriter on the 2001 Offering if they agreed to participate in the restructuring. WorldCom also let banks know that the greater a bank's commitment to the credit facility, the greater the role it could have in the offering. With a commitment of at least $800 million to the new credit facility, a bank was promised a role as "joint book running manager" in the offering.[27] Bank of America calculated that if it were successful in becoming a joint book running manager, it could earn 20 to 25% of an expected investment banking fee of $10 to 12.5 million.

There is evidence that several of the Underwriter Defendants[28] decided to make a commitment to the restructuring of the credit facility and to attempt to win the right to underwrite the 2001 Offering, while at the same time reducing their own exposure to risk from holding WorldCom debt by engaging in hedging strategies, such as credit default swaps.[29] For example, as early as March 23, J.P. Morgan identified one of its three key objectives in connection with the restructuring of the credit facility and its participation in the 2001 Offering as: "to minimize exposure after $800MM initial commitment...." The memorandum recommended developing a strategy that would give up some participation in the 2001 Offering in return for reducing the bank's exposure under the credit facility down to $600 million. It concluded, "Lets [sic] make this a true team effort: first class execution for the client, attractive economics for JPM and the *minimum credit exposure.*" (Emphasis supplied.) Within less than a month, J.P. Morgan wanted to reduce its exposure to $500 million. By May 22, through a carefully managed entry into the market, J.P. Morgan had entered a $150 million credit default swap, out of a goal of $200 million, to reduce its exposure in the event of a default by WorldCom. J.P. Morgan personnel structured its activities so that neither WorldCom nor any of J.P. Morgan's investment banking rivals would learn what it was doing. A May 16 e-mail captured the problem with these words: "if WCOM gets any sense that we're laying off exposure DURING the syndication process (and wouldn't SSB love to pass that along), it would not be good news. Understandably" this point is "Jennifer's

---

**27.** According to a March 28, 2001 Bank of America memorandum, "[b]ecause WCOM needs to refinance its existing Bank Facilities in a tough bank environment, the Company has stated that it will tie the bank refinance with its new $10 billion bond deal. Specifically, the Company stated it plans to only ask a few players (including BAS) to hold $800 million in the new Bank Facilities for Joint Book Running Manager on the bonds."

**28.** This Opinion does not discuss similar evidence regarding SSB, on this and other

points, since it has settled with the Lead Plaintiff. That evidence will be admissible at trial, however, to the extent that SSB's due diligence is at issue.

**29.** A credit default swap enables a lender to hedge its exposure to a borrower. The lender enters into a swap contract and pays a premium for credit default protection to the swap seller. In the event of a failure to pay, the swap seller agrees to pay the lender the value of the loan. If there is no failure to pay, the lender has lost only the premium.

greatest and principal concern." (Emphasis in original.) Jennifer Nason was the bank's due diligence team leader for the 2001 Offering.

Bank of America was in a particularly precarious position. It had been the sole lead arranger and sole book manager for a $10.75 billion senior credit facility for WorldCom in August 2000. It was one of five arrangers for a $2 billion WorldCom trade receivable securitization program. As of March 2001, it had an exposure of approximately $1.5 billion to WorldCom. This exposure was concentrated in a syndicated credit facility of about $600 million, an accounts receivable securitization of $306 million, and a commitment of $175 million to Intermedia. Bank of America sought to make a commitment of $800 million to the restructured credit facility and yet reduce its overall exposure to WorldCom to no more than $500 million through credit default swaps and other devices, again, without telling WorldCom.[30] Those within Bank of America, who were recommending that the bank participate in the restructuring of the credit facility in order to be eligible to play a lead investment banking role in the 2001 Offering, argued in a March 28 memorandum that it was likely that WorldCom would never need to draw on its credit facility—in their words: "No funding anticipated."

### 2000 Form 10–K

The April 26, 2001 WorldCom Form 10–K for the year ending 2000 explained that, if approved by WorldCom's shareholders, the company would create two separately traded tracking stocks to correspond to "the distinct customer bases" served by its businesses. It advised shareholders that if they did not approve the creation of the two stocks, the company would still realign its businesses into the two distinct service entities.

With respect to long-distance services, the document reported that revenue fell in 2000 in absolute terms and as a percentage of total WorldCom revenues. In its description of operations, line costs were shown as a decreasing percentage of revenues for each year from 1998 to 2000, beginning with 45.3% in 1998, and ending at 39.6% in 2000. The Form 10–K explained that the improvement was a result of increased data and dedicated Internet traffic.

### 2001 Offering

Through the 2001 Offering WorldCom issued $11.9 billion worth of notes. The May 9, 2001 registration statement and May 14, 2001 prospectus supplement (collectively, "2001 Registration Statement") for the 2001 Offering incorporated WorldCom's 2000 10–K and first quarter 2001 Form 8–K dated April 26, 2001.

J.P. Morgan and SSB served as co-book runners. Each of the Underwriter Defendants for the 2001 Offering have stated that they relied on the due diligence performed by SSB and J.P. Morgan. Cravath again represented the Underwriter Defendants.

A May 16, 2001 memorandum prepared by Cravath describes the due diligence

---

**30.** The Bank of America communication reflecting this plan reads: "we will get down in this facility to $500MM (through syndication, secondary sales or 364 day credit default swaps) ... we are telling the company $800MM hold though." A February 2 Bank of America memorandum put the problem succinctly: "If we try (and successfully win) Joint Books this quarter of a potential ... Bond deal and then try and exit the Securitization (we are one of the Leads) or significantly lower commitment as the Lead in one of the larger Bank deals out there at $10.25BN ... *WCOM should go nuts."* (Emphasis supplied.)

conducted from April 19[31] through May 16, 2001 in connection with the 2001 Offering.[32] On April 23, the Underwriter Defendants forwarded due diligence questions to WorldCom. The due diligence for the 2001 Offering included telephone calls with WorldCom on April 30 and May 9, and a May 9 telephone call with Andersen and WorldCom. The due diligence inquiry also included a review of WorldCom's board minutes, 1998 revolving credit agreement, SEC filings, and press releases from April 19 to May 16, 2001.

During the April 30 telephone call, two bankers from J.P. Morgan and SSB, and two attorneys from Cravath spoke with Sullivan. Sullivan explained that WorldCom intended to use half of the proceeds from the 2001 Offering "to repay the balance of its outstanding commercial paper, to retire debt and to fund a portion of the Company's negative free cash flow." When asked whether WorldCom had significant reserves for bad receivables, Sullivan responded that WorldCom had a general $1.1 billion reserve. Sullivan indicated that WorldCom was comfortable with the current earnings per share, that there were no issues that could affect the company's credit rating, and that the company had nothing material to disclose that had not been discussed with the investment bankers. When asked about the competitive environment, Sullivan answered that

> the general economic slowdown has not had a material impact on the Company's business, however the telecommunication environment has affected the Company. In particular, he was surprised that receivables declined in the first quarter. Despite this, the Company is

selling through the rough parts of the telecommunications slowdown and the number of new installations is still strong.

On May 9, Sullivan confirmed that there were no material changes since the April 30 telephone call.

On May 9, a banker from J.P. Morgan and two Cravath attorneys spoke by telephone with Sullivan and Stephanie Scott of WorldCom and with representatives of Andersen. Andersen indicated that it had not issued any management letters to WorldCom and that there were no accounting concerns. WorldCom and Andersen assured J.P. Morgan that there was nothing else material to discuss. In neither the April 30 due diligence telephone call nor the May 9 call did Sullivan disclose the $771 million capitalization of line costs.

On May 9 and 16, Andersen issued comfort letters for the WorldCom first quarter 2001 financial statement. The 2001 comfort letters stand in contrast to the 2000 comfort letter, which expressed that nothing had come to Andersen's attention to cause it to believe that "[a]ny material modifications should be made to the unaudited condensed consolidated financial statements described in 4(a)(1), incorporated by reference in the Registration Statement, for them to be in conformity with generally accepted accounting principles" or that "[t]he unaudited condensed consolidated financial statements . . . do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related published rules and regulations." In 2001, by comparison, the letters indicated that nothing had come to Andersen's attention that caused it to

---

**31.** The memorandum lists the date as April 19, 2000. It is assumed that it should be April 19, 2001.

**32.** The memorandum indicates that the due diligence for WorldCom for the period from August 16, 1999 to May 23, 2000 is contained in a memorandum of May 26, 2000.

believe that the financial statements "were not determined on a basis substantially consistent with that of the corresponding amounts in the audited consolidated balance sheets of WorldCom as of December 31, 2000 and 1999, and the consolidated statements of operations, shareholders' investment and cash flows for each of the three years in the period ended December 31, 2000 . . . ." A J.P. Morgan banker and a Cravath attorney noticed the absence of the "negative GAAP assurance" in the 2001 comfort letter. An SSB banker noted that the issue was important to understand but advised against getting "too vocal" about it since "WorldCom's a bear to deal with on that subject."

Some of the investment bankers responsible for performing due diligence in connection with the 2001 Offering were aware of their own bank's credit concerns regarding WorldCom, and some were not. For instance, the lead investment banker for J.P. Morgan testified that she was unaware of her bank's memorandum downgrading WorldCom's risk rating. Two investment bankers at Deustche Bank testified that they were aware that their bank had downgraded WorldCom's credit rating. One testified that he believed that the downgrading was "too early"; the other testified that the downgrading was not inconsistent with the information that was in the public domain.[33]

The 2001 Offering was preceded by a road show in America and Europe in which WorldCom, J.P. Morgan, and SSB made presentations to convince potential investors to purchase the bonds. A script for that presentation begins with the following statement:

Welcome to WorldCom's Multi-billion Global Debt Offering Roadshow presentation. . . . On behalf of J.P. Morgan and SSB as joint bookrunners, our joint lead managers, and co-managers, we are excited about the WorldCom credit story and this debt offering. . . . We value WorldCom's senior debt at low single A with a stable credit trend. . . . WorldCom's financial position gives it the strongest credit profile of any of the largest broadband providers.

Later in the script, there were representations about WorldCom's revenue in 2000 and a representation that the peak in the company's capital expenditures was behind it. The script included a comparison of 1999 and 2000 credit ratios for WorldCom. This comparison suggested an improving trend in revenues and in the "EBITDA [34] coverage ratio" from 1999 to 2000. The comparison of 1999 and 2000 credit ratios appears in the script despite an April 24 comment by a J.P. Morgan analyst that those credit ratios were "misleading" because WorldCom's "financial profile will be more leveraged in 2001." She suggested substituting long term target ratios.

The May 9 Prospectus for the 2001 Offering explained that it was part of a registration statement filed with the SEC using a " 'shelf' registration process" that permitted it to sell any combination of debt securities in one or more offerings up to a total remaining dollar amount of just under $12 billion. It warned that the investor "should rely only on the information

---

**33.** The Lead Plaintiff contends that the lead investment banker for Bank of America was aware that her bank's credit experts had downgraded WorldCom, and that she testified that that knowledge did not influence her due diligence and that she did not advise any other Underwriter Defendant or Cravath that her bank had downgraded WorldCom. The Lead Plaintiff has not included with its summary judgment papers the deposition pages that would confirm that description.

**34.** EBITDA stands for earnings before interest, taxes, depreciation, and amortization.

incorporated by reference or provided in this prospectus and any supplement. We have not authorized anyone else to provide you with different information." It described the use of proceeds as "for general corporate purposes," which may include "repayment of indebtedness, acquisitions, additions to working capital, and capital expenditures." The remainder of the prospectus described the debt securities that would be offered. At the end of the document, it advised that WorldCom's year-end financial statements for each of the years in the three-year period ending December 31, 2000 had been audited by Andersen, and were incorporated by reference "in reliance upon the authority of such firm as experts in accounting and auditing in giving such reports."

The Prospectus Supplement contained information about WorldCom, including selected financial information. Under a section labeled "recent developments," it announced that the WorldCom group revenue increased over the same period in 2000, but that the MCI group's revenues had declined. It described the use of proceeds as "for general corporate purposes, including to repay commercial paper, which was issued for general corporate purposes." [35]

After describing the underwriters' commitments to buy portions of the 2001 Offering, the 2001 Registration Statement advised that

> the underwriters and their affiliates have performed certain investment banking, advisory and general financing and banking services for us from time to time for which they have received customary fees and expenses. The underwriters and their affiliates may, from time to time, be customers of, engage in transactions with and perform services for us in the ordinary course of their business. Certain of the underwriters and their affiliates have in the past and may in the future act as lenders in connection with our credit facilities.

### Discussion

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and as such, "always bears the initial responsibility of . . . identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *accord Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir.2002). In making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir.2002).

When the moving party has asserted facts showing that it is entitled to sum-

---

**35.** In working on the draft of this document, a Cravath attorney had opined that this description was "too broad" and needed to be revised to add more detail of WorldCom's intentions.

mary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir.2002). While evidence as a whole must be assessed to determine whether there is a trial-worthy issue, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), conclusory statements are insufficient to defeat a motion for summary judgment. *Opals on Ice Lingerie v. Body Lines*, 320 F.3d 362, 370 n. 3 (2d Cir.2003). Throughout its consideration of a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on the admissible evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

### I. *Legal Framework*

The "primary innovation" of the Securities Act was the creation of duties in connection with public offerings, principally "registration and disclosure obligations." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571,

115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The purpose of the Act was to "eliminate serious abuses in a largely unregulated securities market." *United Hous., Found., Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Liability under Section 11 of the Securities Act flows from the requirements for filing a registration statement. Liability under Section 12(a)(2) flows from the requirement to distribute prospectuses.

### A. *Section 11*

■ Section 11 of the Securities Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).[36] Purchasers of securities issued

---

**36.** Section 11 states in pertinent part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may ... sue—

 (1) every person who signed the registration statement;

 (2) every person who was a director of ... the issuer ...;

. . . .

 (4) every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement ...;

 (5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the

pursuant to a registration statement may sue if they purchased at the time of the initial public offering, or if they are "after-market purchasers who can trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003).

A registration statement "means a filing that includes the prospectus and other information required by section 7 of the Securities Act." 12 C.F.R. § 16.2(m). A prospectus is defined as "an offering document that includes the information required by section 10(a) of the Securities Act." 12 C.F.R. § 16.2(*l*).

Section 7(a) of the Securities Act provides that registration statements must be accompanied by the information and documents specified in Schedule A of the Act, which sets forth thirty-two items that must be included in a registration statement. 15 U.S.C. §§ 77g(a), 77aa. Section 7(a) also authorizes the SEC to enact "rules or regulations" so that "disclosure fully adequate for the protection of investors is otherwise required to be included within the registration statement." 15 U.S.C. § 77g(a). Pursuant to Section 7(a), the SEC issued Regulations S–X, 17 C.F.R. § 210 *et seq.,* and S–K, 17 C.F.R. § 229 *et seq.* Regulation S–X governs the form and content of financial statements required to be included in a registration statement. Regulation S–K dictates the non-financial information that must be included in a registration statement.[37] In a catch-all provision, the SBC regulations also provide that "[i]n addition to the information expressly required to be included in a registration statement, *there shall be added such further material information, if any, as may be necessary to make the required statements,* in the light of the circumstances under which they are made, *not misleading.*" 17 C.F.R. § 230.408 (emphasis supplied). *See DeMaria,* 318 F.3d at 180.

 Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). This design reflects Congress' sense that underwriters, issuers, and accountants bear a "moral responsibility to the public [that] is particularly heavy." *Gustafson,* 513 U.S. at 581, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., at 5 (1933)). As a result, such parties will be found to have violated Section 11 whenever "material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991) (citation omitted).

 In determining whether a registration statement is materially misleading, the "central inquiry" is "whether defendants' representations, taken together and in context, would have misled a reasonable

registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

15 U.S.C. § 77k(a).

37. Regulations S–X and S–K, which were developed as parts of the "integrated disclosure system," which is described below, also address the form and content of disclosure under the Exchange Act. *See, e.g.,* 2 Louis Loss & Joel Seligman, *Securities Regulation* 607 (3d ed.1999).

investor about the nature of the investment." *I. Meyer Pincus*, 936 F.2d at 761 (citation omitted).[38] A material fact is one that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *DeMaria*, 318 F.3d at 180 (citation omitted). *See also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir.1987) (citation omitted).

An omitted fact may be immaterial if it is "trivial," or "so basic that any investor could be expected to know it." *Ganino*, 228 F.3d at 162 (citation omitted). In a similar vein, a misrepresentation may be immaterial as a matter of law where "adequate cautionary language [is] set out in the same offering." *Rombach*, 355 F.3d at 173 (citation omitted). Materiality remains, however, "a mixed question of law and fact." *Ganino*, 228 F.3d at 162. Since materiality is necessarily a "fact-specific inquiry," *Basic. Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), courts within the Second Circuit have "consistently rejected a formulaic approach to assessing the materiality" of misrepresentations. *Ganino*, 228 F.3d at 162.

■ Because of the fact-intensive inquiry that accompanies any analysis of materiality, a registration statement or prospectus must be read "as a whole." *DeMaria*, 318 F.3d at 180 (citation omit-

ted). *See also Rombach*, 355 F.3d at 172 n. 7; *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker Usa.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002). Or, as the Second Circuit has explained even more recently, the inquiry must focus not on whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *DeMaria*, 318 F.3d at 180 (citation omitted). A prospectus violates Section 11 "if it does not disclose material objective factual matters, or buries those matters beneath other information, or treats them cavalierly." *Id.* (citation omitted).

Section 11 provides two affirmative defenses. First, the statute provides an affirmative defense where a defendant can prove that the loss in value of a security is due to something other than misleading statements within a registration statement. Specifically, Section 11(e) provides:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or

---

38. The standard for materiality under Sections 11 and 12 of the Securities Act is "identical to that under Section 10(b)" of the Exchange Act. *Rombach v. Chang*, 355 F.3d 164, 178 n. 11 (2d Cir.2004).

necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. 15 U.S.C. § 77k(e). A defendant's burden in establishing this defense is heavy since "the risk of uncertainty" is allocated to defendants. *Akerman v. Oryx Comm., Inc.*, 810 F.2d 336, 341 (2d Cir.1987); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048–49 (2d Cir.1995).

■ In addition, Section 11 provides an affirmative defense of "due diligence," which is available to defendants other than the issuer of the security. *See Huddleston*, 459 U.S. at 382, 103 S.Ct. 683; *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370–71 (2d Cir.1973). The standard that applies to this defense varies depending on whether the misleading statement in the registration statement is or expressly relies on an expert's opinion. The due diligence defense is discussed further below.

## B. *Section 12*

Section 12(a)(2) of the Securities Act (formerly Section 12(2)) allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77*l*(a)(2). The section entitles the buyer

> to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Id.; Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 615 (2d Cir.1994); *see also Randall v. Loftsgaarden*, 478 U.S.

647, 655, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) ("§ 12(2) prescribes the remedy of rescission except where the plaintiff no longer owns the security.").

■ Section 12 turns on status, not scienter: It imposes liability without requiring "proof of either fraud or reliance." *Gustafson*, 513 U.S. at 582, 115 S.Ct. 1061; *see also Rombach*, 355 F.3d at 164. A plaintiff need only show "some causal connection between the alleged communication and the sale, even if not decisive." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 361 (2d Cir.1992) (citation omitted). "Reliance by the buyer need not be shown, for § 12(2) is a broad anti-fraud measure and imposes liability whether or not the purchaser actually relied on the misstatement." *Id.* (citation omitted).

■ Defendants may be liable under Section 12(a)(2) either for selling a security or for soliciting its purchase. First, Section 12 creates a cause of action against sellers who "passed title, or other interest in the security, to the buyer for value." *Pinter v. Dahl*, 486 U.S. 622, 642, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *see also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989) (applying *Pinter*'s § 12(1) analysis to what is now § 12(a)(2)); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988) (same). To be liable as a seller, the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n. 21, 108 S.Ct. 2063. As underwriters in a firm commitment underwriting become the owners of any unsold shares, they may be liable as sellers for direct sales to the public. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 283.

■ Second, persons who are not in privity with the plaintiff may be liable if they "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647, 108 S.Ct. 2063; *see also Commercial Union Assurance Co.*, 17 F.3d at 616. In finding that Section 12 included liability for solicitation, the Supreme Court observed that "[t]he solicitation of a buyer is perhaps the most critical stage of the selling transaction . . . . [and] the stage at which an investor is most likely to be injured." *Pinter*, 486 U.S. at 646, 108 S.Ct. 2063.

■ Section 12(a)(2) provides affirmative defenses that parallel those available for a Section 11 claim. First, the statute prohibits recovery to the extent that

> the person who offered or sold such security proves that any portion or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from such resulting from such part of the prospectus or oral communications, with respect to which liability of that person is asserted . . . .

15 U.S.C. § 77*l*(b). In addition, Section 12(a)(2) provides an affirmative defense of reasonable care. *See Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1019 (2d Cir.1989).

II. *Lead Plaintiff's Motion for Partial Summary Judgment*

Lead Plaintiff moves for partial summary judgment on the issue of whether certain statements regarding WorldCom's financial condition in its financial statements, that were incorporated into the 2000 and 2001 Registration Statements, were false. With respect to the 2000 Registration Statement, the Lead Plaintiff's motion is addressed to the reporting of line costs and depreciation and amortization. With respect to the 2001 Registration Statement, the Lead Plaintiff's motion is addressed to the reporting of line costs, capital expenditures, and assets and goodwill.

The Underwriter Defendants concede that the reporting of line costs and capital expenditures for the first quarter of 2001 was false. They resist summary judgment regarding the falsity of any other line of financial reporting with respect to the 2000 and 2001 Registration Statements. They assert that Andersen's professional judgment regarding certain items has not been shown to be unreasonable. For example, they argue that Andersen used reasonable judgment in deciding that MCI's workforce and customer base should be included in goodwill. They also assert that there are disputed issues of fact regarding the materiality of certain of the alleged false statements. For example, they argue that only those statements that are relevant to cash flow would be material to bondholders since bondholders are entitled to be paid principal and interest regardless of the price movements in a company's stock.

The Underwriter Defendants argue in addition that the Lead Plaintiff's motion does not address their affirmative defense of due diligence and their entitlement to rely on Andersen's audits and comfort letters. They argue that they are entitled to further discovery of Lead Plaintiff's experts and of ten "embargoed" witnesses,[39] the latter of whom they contend will agree

---

**39.** Although fact discovery closed on July 9, 2004, the parties in the *Securities Litigation* were permitted to reserve time to depose ten witnesses that the Government deems critical to its prosecution of Ebbers following their testimony in Ebbers' criminal trial. Ebbers' trial is scheduled to begin on January 17, 2005.

that no amount of due diligence would have uncovered the accounting fraud.[40]

Since there is no material issue of fact in dispute regarding the falsity of World-Com's first quarter financial statement for 2001 insofar as it reported WorldCom's line costs, or the materiality of that false statement to investors purchasing notes in the 2001 Offering, the Lead Plaintiff is entitled to summary judgment on the issue of whether the Registration Statement for the 2001 Offering was false and misleading. The Lead Plaintiff's motion for summary judgment on the 2000 Offering, and on any other purported false statement made in connection with the 2001 Offering is denied.

III. *The Underwriter Defendants' Motion for Summary Judgment; The Financial Statements*

The Underwriter Defendants move for summary judgment with respect to the financial statements that were incorporated into the Registration Statements. They assert that there is no dispute that they acted reasonably in relying on Andersen's audits and comfort letters. The Underwriter Defendants contend that they were entitled to rely on WorldCom's audited financial statements and had no duty to investigate their reliability so long as they had "no reasonable ground to believe" that such financial statements contained a false statement. They also assert that they were entitled to rely in the same way on Andersen's comfort letters for the unaudited quarterly financial statements incorporated into the Registration Statements.

Before analyzing the Underwriter Defendants' arguments, it will be helpful to describe the legal and regulatory framework surrounding the "due diligence defenses," which are in turn composed of a reliance defense and a due diligence defense. Following a brief description of the role of the underwriters, the Opinion will discuss the due diligence defenses under Sections 11 and 12(a)(2); the role of accountants as experts; the enactment in the 1980s of integrated disclosure, shelf registration, and SEC Rule 176, as well as their impact on underwriters' due diligence obligations; the reliance defense as described in case law and the impact on that defense of the existence of red flags; and the case law regarding the due diligence defense. With that background, the specific argument presented by the Underwriter Defendants will be addressed.

**40.** As described below, the Underwriter Defendants are entitled to rely on the due diligence defense whether or not it would have uncovered the fraud. Conversely, they must shoulder the burden of establishing their due diligence even if that due diligence would not have revealed the existence of fraudulent conduct. The parties have not addressed whether the Underwriter Defendants' argument in this regard would be more persuasive under Section 12(a)(2). *Compare* 5 Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* § 3:158 (West 2004) (contending that a defendant could successfully establish a reasonable care defense under Section 12(a)(2) "if he does not exercise reasonable care but would have been unable to ascertain the falsity even if he had used reasonable care") *with* 3B Harold S. Bloomenthal &

Samuel Wolff, *Securities & Federal Corporate Law* § 12:6 (2d ed. 1998) ("Given the role of an underwriter, in order to avoid Section 12(a)(2) liability it must make a reasonable investigation in order to establish that it used reasonable care.").

In *Demarco v. Edens,* 390 F.2d 836 (2d Cir.1968), the Court of Appeals affirmed a judgment following trial that an issuer had used "reasonable care" in selecting an underwriter and did not know that the underwriter would not remit the proceeds of the sale of securities. *Id.* at 842. The court observed both that the issuer had taken the steps necessary to show its reasonable care but also that it did not need to "probe[ ] more deeply into the background and affairs" of the underwriter as "[f]urther inquiry ... would have disclosed nothing." *Id.* at 843.

## A. Role of the Underwriter

An underwriter is commonly understood to be a "person who buys securities directly or indirectly from the issuer and resells them to the public, or performs some act (or acts) that facilitates the issuer's distribution." *In re WorldCom, Inc. Sec. Litig.*, 308 F.Supp.2d 338, 343 (S.D.N.Y.2004) (citation omitted). As the SEC has observed, in enacting Section 11, "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions would provide the necessary incentive to ensure their careful investigation of the offering." The Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed.Reg. 67174, 67230, *available at* 1998 WL 833389 (Dec. 4, 1998) ("SEC Rel. 7606A"). At the same time, Congress specifically rejected the notion of underwriters as insurers. H.R. Conf. Rep. No. 73–152, at 277 (1933); SEC Rel. 7606A, 63 Fed.Reg. at 67230. Rather, it imposed upon underwriters the obligation to "exercise diligence of a type commensurate with the confidence, both as to integrity and competence," placed in them by those purchasing securities. H.R. Conf. Rep. No. 73–152, at 277.

■ Underwriters must "exercise a high degree of care in investigation and independent verification of the company's representations." *Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544, 582 (E.D.N.Y.1971). Overall, "[n]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter." *Chris–Craft*, 480 F.2d at 370. Underwriters function as "the first line of defense" with respect to material misrepresentations and omissions in registration statements. 2 Gary M. Lawrence, *Due Diligence in Business Transactions* § 2.03A (2004) ("Lawrence, *Due Diligence*"). As a consequence, courts must be "particularly scrupulous in examining the[ir] conduct." *Feit*, 332 F.Supp. at 581; *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 612–13 (S.D.Tex.2002).

## B. The "Due Diligence" Defenses

The phrase "due diligence" does not appear in the Securities Act, but two of the affirmative defenses available under Section 11(b) are collectively known as the "due diligence" defense. *See* Lawrence, *Due Diligence* § 2.03A. The first such defense provides that "as regards any part of the registration statement not purporting to be made on the authority of an expert," a defendant will not be liable upon a showing that

> *he had, after reasonable investigation, reasonable ground to believe and did believe,* at the time such part of the registration statement became effective, *that the statements* therein *were true* and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(A) (emphasis supplied). This defense is understood as "a negligence standard." *Hochfelder*, 425 U.S. at 208, 96 S.Ct. 1375. The SEC has described the duty of an underwriter to conduct a reasonable investigation as follows:

> By associating himself with a proposed offering [an underwriter] impliedly represents that he has made such an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus. The underwriter who does not

make a reasonable investigation is derelict in his responsibilities to deal fairly with the investigating public.

41 SEC 398 [1961–1964 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 76,904, 1963 WL 63647 (Feb. 27, 1963).

There is a different standard that applies when a Section 11 defendant is entitled to rely upon the opinion of an expert. "[A]s regards any part of the registration statement purporting to be made on the authority of an expert," a defendant other than that expert will not be liable if he demonstrates that

> he had *no reasonable ground to believe and did not believe,* at the time such part of the registration statement became effective, *that the statements therein were untrue* or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(C) (emphasis supplied).[41]

Although the requirements of due diligence vary depending on whether the registration statement has been made in part or in whole on the authority of an expert, the standard for determining what constitutes a reasonable investigation and reasonable ground for belief is the same: "[T]he standard of reasonableness shall be that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c).

Courts have distinguished between these two standards by labeling them the due diligence defense and the reliance defense, referring in the latter case to the reliance permitted by the statute on an expert's statement. *See, e.g., Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1421 (9th Cir.1994); *Ackerman v. Schwartz,* 947 F.2d 841, 845 (7th Cir.1991); *Feit,* 332 F.Supp. at 576.

Section 12(a)(2) has a defense of reasonable care that is less demanding than the duty of due diligence imposed under Section 11. Section 12(a)(2) provides that a defendant shall not be liable if he "sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" which is "necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).

Thus, while Section 11 imposes a duty to conduct a reasonable investigation as to any portion of a registration statement not made on the authority of an expert, Section 12(a)(2) does not make any distinction based upon "expertised" statements and only requires the defendant to show that it used reasonable care. This difference is attributable to the emphasis placed on the importance of registration statements and the underwriter's vital role in assuring their accuracy. *See John Nuveen & Co. v. Sanders,* 450 U.S. 1005, 1009, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981) (Powell, J., dissenting from denial of cert.). Because Section 11 imposes a more exacting stan-

---

**41.** Section 11 also provides a defense to an expert as concerns "any part of the registration statement purporting to be made upon his authority as an expert." The expert must prove that

> he had, *after reasonable investigation, reasonable ground to believe and did believe,* at the time such part of the registration state-

ment became effective, *that the statements therein were true* and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(B) (emphasis supplied).

dard, this Opinion principally addresses the law that applies to Section 11.

## C. *Accountants as Experts*

 Although Section 11(b) furnishes different standards, depending on whether a statement is made on the authority of an expert, the statute does not define the term "expert." Section 11(a)(4) lists professions that give a person authority to make a statement, which on consent can be included in a registration statement. 15 U.S.C. § 77k(a)(4). The list of professions includes an accountant. *Id.* Thus, while Section 11(b) does not define the term expert or explain what sort of documents and/or work constitutes that "made on an expert's authority," it is settled that an accountant qualifies as an expert, and audited financial statements are considered expertised portions of a registration statement. *See, e.g., In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994); *Enron,* 235 F.Supp.2d at 613; SEC Rel. 7606A, 63 Fed.Reg. at 67233.

 Not every auditor's opinion, however, qualifies as an expert's opinion for purposes of the Section 11 reliance defense. To distinguish among auditor's opinions, some background is in order. While financial statements [42] are prepared by the management of a company, an accountant serving as the company's auditor may give an opinion as to whether the financial statements have been presented in conformity with GAAP. This opinion is given after the accountant has performed an audit of the company's books and records. Audits are generally completed once a year, in connection with a company's year-end financial statements. There are ten audit standards with which an auditor must comply in performing its annual audit. They are known as Generally Accepted Auditing Standards ("GAAS"). If an auditor signs a consent to have its opinion on financial statements incorporated into a company's public filings, the opinion may be shared with the public through incorporation.

Public companies are also required under the Exchange Act to file quarterly financial statements, which are referred to as interim financial statements. While not subject to an audit, interim financial statements included in Form 10–Q quarterly reports are reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by GAAS. The standards for the review of interim financial statements are set forth in Statement of Auditing Standards No. 71, Interim Financial Information ("SAS 71"). When a public company files a registration statement for a sale of securities, the auditor is customarily asked by underwriters to provide a comfort letter. The comfort letter will contain representations about the auditor's review of the interim financial statements. Guidance about the content of comfort letters is contained in the Statement on Auditing Standards No. 72, Letters for Underwriters and Certain Other Requesting Parties ("SAS 72"). There is frequently more than one comfort letter for a transaction: an initial comfort letter, and a second or "bringdown" comfort letter issued closer to the time of closing.

In order for an accountant's opinion to qualify as an expert opinion under Section 11(b)(3)(C), there are three prerequisites. First, it must be reported in the Registration Statement. Second, it must be an audit · opinion. Finally, the accountant

---

**42.** Financial statements are generally understood to include a balance sheet, an income statement, a statement of changes in stock-holders' equity, a statement of cash flow, and related note disclosures.

must consent to inclusion of the audit opinion in the registration statement.

In an effort to encourage auditor reviews of interim financial statements, the SEC acted in 1979 to assure auditors that their review of unaudited interim financial information would not subject them to liability under Section 11. *See* Accountant Liability for Reports on Unaudited Interim Financial Information, SEC Release No. 6173, 1979 WL 169953, at *1 (Dec. 28, 1979) ("SEC Rel. 6173"). The SEC addressed the circumstances in which an accountant's opinion can be considered an expert's opinion for purposes of Section 11(b) and made it clear that reviews of unaudited interim financial statements do not constitute such an opinion. Under Rule 436, where the opinion of an expert is quoted or summarized in a registration statement, or where any information contained in a registration statement "has been reviewed or passed upon" by an expert, the written consent of the expert must be filed as an exhibit to the registration statement. 17 C.F.R. § 230.436(a), (b). Yet written consent is not sufficient to convert an opinion or review into an expertised statement. Rule 436 provides that notwithstanding written consent, "*a report on unaudited interim financial information* ... by an independent accountant who has conducted a review of such interim financial information *shall not be considered a part of a registration statement prepared or certified by an accountant* or a report prepared or certified by an accountant within the meaning of sections 7 and 11" of the Securities Act. 17 C.F.R. § 230.436(c) (emphasis supplied).

Rule 436 also defined the term "report on unaudited interim financial information." It consists of a report that contains the following five items:

(1) A statement that the review of interim financial information was made in accordance with established professional standards for such reviews;

(2) An identification of the interim financial information reviewed;

(3) A description of the procedures for a review of interim financial information;

(4) A statement that a review of interim financial information is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is an expression of opinion regarding the financial statements taken as a whole, and, accordingly, no such opinion is expressed; and

(5) A statement about whether the accountant is aware of any material modifications that should be made to the accompanying financial information so that it conforms with generally accepted accounting principles.

17 C.F.R. § 230.436(d).[43]

In promulgating Rule 436, the SEC contrasted accountants' review of year-end financial statements with those of interim financial data, remarking that

*The objective of a review of interim financial information differs significantly from the objective of an examination of financial statements in accordance with generally accepted auditing standards.* The objective of an audit is to provide a reasonable basis for expressing an opinion regarding the finan-

---

**43.** SAS 71 states that an accountant's "report accompanying interim financial information that he or she has reviewed should consist of" the five components of the Rule 436 definition as well as three additional requirements, such as a statement that the financial information is the responsibility of the company's management. Statement on Auditing Standards 71, *Codification of Auditing Standards and Procedures,* "Interim Financial Information" (AICPA, *Professional Standards,* vol. 1, AU § 722).

cial statements taken as a whole. A review of interim financial information does not provide a basis for the expression of such an opinion, because the review does not contemplate a study and evaluation of internal accounting control; tests of accounting records and of responses to inquiries by obtaining corroborating evidential matter through inspection, observation, or confirmation; and certain other procedures ordinarily performed during an audit. A review may bring to the accountant's attention significant matters affecting the interim financial information, but it does not provide assurance that the accountant will become aware of all significant matters that would be disclosed in an audit.

Accountant Liability for Reports on Unaudited Interim Financial Information Under Securities Act of 1933, SEC Release No. 6127, 1979 WL 170299 (Sept. 20, 1979), at *3 (citation omitted) ("SEC Rel. 6127") (emphasis supplied).

Rule 436 underscores that SAS 71 reports and SAS 72 letters are not expertised statements within the meaning of the Section 11 reliance defense. Specifically, in finalizing Rule 436, the SEC directed that

> [i]n any suit for damages under Section 11(a), the directors and *underwriters should not be able to rely on SAS No. [71] reports on interim financial data included in a registration statement* as statements "purporting to be made on the authority of an expert ... which they had no ground to believe ... were untrue ..." under Section 11(b)(3)(C). Rather, *underwriters* and directors *should be required*, as has previously

been the case whenever unaudited financials are included in a registration statement, *to demonstrate affirmatively* under Section 11(b)(3)(A) *that, after conducting a reasonable investigation, they had reasonable ground to believe, and did believe, that the interim financial data was true.*[44]

SEC Rel. 6173, 1979 WL 169953, at *4 (emphasis supplied). Given this, the SEC expects that "underwriters will continue to exercise due diligence in a vigorous manner with respect to SAS No. [71] reports." *Id.* at *4.

■ In sum, underwriters can rely on an accountant's audit opinion incorporated into a registration statement in presenting a defense under Section 11(b)(3)(C). Underwriters may not rely on an accountant's comfort letters for interim financial statements in presenting such a defense. Comfort letters do not "expertise any portion of the registration statement that is otherwise non-expertised." William F. Alderman, *Potential Liabilities in Initial Public Offerings, in How To Prepare an Initial Public Offering 2004* 405–06 (2004); *see also* Committee on Federal Regulation of Securities, *Report of Task Force on Sellers' Due Diligence and Similar Defenses Under the Federal Securities Laws,* 48 Bus. Law. 1185, 1210 (1993) (*"Task Force Report"*) (underwriters "remain responsible" for unaudited interim financial information as in the case of other non-expertised information).

D. *Integrated Disclosure, Shelf Registration, and Rule 176*

Beginning in the late 1960s, the SEC embarked on a "program to integrate the

---

**44.** At the time that Rule 436 was implemented, SAS 24 was the governing standard for auditors' reviews of unaudited interim financial statements. In 1992, it was superceded by SAS 71, which was in effect during the

events at issue here. *See* John J. Huber et al., *An Underwriter's Due Diligence in the Permitted Absence of an Expert's Consent,* Insights, Aug. 2002, at 2 n. 23.

disclosure requirements of the Securities Act and the Securities Exchange Act of 1934." *See* Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, 1981 WL 31062, at *1 (Aug. 6, 1981) ("SEC Rel. 6335"). The chief purpose of the integrated disclosure system was to furnish investors with "meaningful, nonduplicative information both periodically and when securities distributions are made to the public," while decreasing "costs of compliance for public companies." Reproposal of Comprehensive Revision to System for Registration of Securities Offerings, SEC Release No. 6331, 1981 WL 30765, at *2 (Aug. 6, 1981) ("SEC Rel. 6331").

Although earlier steps toward integration had been taken, the SEC aimed in the early 1980s to integrate the two acts, "primarily by incorporating by reference Exchange Act reports into Securities Act registration statements." SEC Rel. 6335, 1981 WL 31062, at *3. The push to incorporate by reference was motivated by the growing recognition that "for companies in the top tier, there is a steady stream of high quality corporate information continually furnished to the market and broadly digested, synthesized and disseminated." Shelf Registration, SEC Release No. 6499, 1983 WL 408321, at *2 (Nov. 17, 1983) ("SEC Rel. 6499"). The SEC reasoned that top-tier companies should be able to incorporate their Exchange Act filing by reference, since these disclosures, along with "other communications by the registrant, such as press releases, ha[ve] already been disseminated and accounted for by the market place." SEC Rel. 6331, 1981 WL 30765, at *4. Those eligible include issuers who, among other things, either have substantial equity "floats" or rated debt securities. Incorporation by reference was implemented by introducing a new, shortened registration form—Form S-3—for use by "companies which are widely followed by professional analysts." *Id.* In a Form S-3 registration, the registrant's Form 10-K from the most recently concluded fiscal year and all subsequent periodic Exchange Act filings between the end of that fiscal year and the termination of the offering are required to be incorporated by reference. Given the reduced length of the form, the process of filing a Form S-3 is known as short-form registration.

Short-form registration was accompanied by related changes in shelf registration, the process by which securities are registered to be offered or sold on a delayed or continuous basis. The purpose of shelf registration is to allow a single registration statement to be filed for a series of offerings. SEC Rel. 6499, 1983 WL 408321, at *4. Shelf registration aims to afford the issuer the "procedural flexibility" to vary "the structure and terms of securities on short notice" and "time its offering to avail itself of the most advantageous market conditions." *Id.* More concretely, shelf registration enables

> an issuer that wishes to sell some or all of the registered securities at any point during the two year period to contact the several managing underwriters named in the registration statement, determine which underwriter will give it the best terms, and offer the security to the market through that underwriter in a matter of hours.

Merritt B. Fox, *Shelf Registration, Integrated Disclosure, and Underwriter Due Diligence: An Economic Analysis,* 70 Va. L.Rev. 1005, 1005 n. 4 (1984).

Although shelf registration had been available prior to the introduction of integrated disclosure, integrated disclosure mandated a reexamination of which securi-

ties could be offered on a continuous or delayed basis. Under Rule 415, which was finalized in 1983, all registrants eligible to use Form S–3 may engage in shelf registration "in an amount ... reasonably expected to be offered and sold within two years from the initial effective date of the registration." [45] 17 C.F.R. §§ 230.415(a)(1)(x), (a)(2). As amended in 1992, Rule 415 allows registration of shelf offerings without requiring registrants to allocate the total amount to specific classes of securities. As a result, issuers can "decide as late as the point of sale which of its securities to use." SEC Rel. 7606A, 63 Fed.Reg. at 67179.

Together, the mechanism of incorporation by reference and the expansion of shelf registration significantly reduced the time and expense necessary to prepare public offerings, thus enabling more "rapid access to today's capital markets." SEC Rel. 6335, 1981 WL 31062, at *4. As the SEC recognized, these changes affected the time in which underwriters could perform their investigations of an issuer. Underwriters had weeks to perform due diligence for traditional registration statements. By contrast, under a short-form registration regime, "[p]reparation time is reduced sharply" thanks to the ability to incorporate by reference prior disclosures. *Id.* at *5.

These two innovations triggered concern among underwriters. Members of the financial community worried about their ability "to undertake a reasonable investigation with respect to the adequacy of the information incorporated by reference from periodic reports filed under the Exchange Act into the short form registration statements utilized in an integrated disclosure system." *Id.* at *1. Specifically, underwriters expressed concern that

> this reduction in preparation time, together with competitive pressures, will restrict the ability of responsible underwriters to conduct what would be deemed to be a reasonable investigation, pursuant to Section 11, of the contents of the registration statement.... [I]ssuers may be reluctant to wait for responsible underwriters to finish their inquiry, and may be receptive to offers from underwriters willing to do less.

*Id.* at *5. Because an underwriter could select among competing underwriters when offering securities through a shelf registration, some questioned whether an underwriter could "afford to devote the time and expense necessary to conduct a due diligence review before knowing whether it will handle an offering and that there may not be sufficient time to do so once it is selected." SEC Rel. 6499, 1983 WL 408321, at *5. Others doubted whether they would have the chance "to apply their independent scrutiny and judgment to documents prepared by registrants many months before an offering." *Id.*

---

**45.** Although Rule 415 was not finalized until 1983, it was proposed concurrently with the development of Form S–3 and Rule 176, which is discussed below. *See generally* SEC Rel. 6335, 1981 WL 31062, at *2 (listing a "three tier system for the registration of securities, Forms S–1, S–2 and S–3" and "a new rule governing registration of securities to be sold in a continuous or delayed offering" among several rulemaking proposals announced on the same day as Rule 176).

Rule 415 does not limit shelf registration to those issuers eligible to use Form S–3, but also permits shelf registration for "traditional primary and secondary shelf offerings," including "those where securities are sold to employees, customers or existing shareholders; those involving interests in limited partnerships; those related to acquisitions and other business combinations; and those of securities underlying options, warrants, rights or conversions." SEC Rel. 6499, 1983 WL 408321, at *7; *see generally* 17 C.F.R. § 230.415.

Because of concerns like those described here, the SEC introduced Rule 176 in 1981 "to make explicit what circumstances may bear upon the determination of what constitutes a reasonable investigation and reasonable ground for belief as these terms are used in Section 11(b)." SEC Rel. 6335, 1981 WL 31062, at *1. Rather than give underwriters a "safe harbor from liability for statements made in incorporated Exchange Act reports," [46] *id.* at *7, as some suggested should happen, the SEC turned to the American Law Institute's proposed Federal Securities Code for guidance. Rule 176, which largely mirrors Section 1704(g) of the Code, provides in relevant part:

> In determining whether or not the conduct of a person constitutes a reasonable investigation or a reasonable ground for belief meeting the standard set forth in section 11(c), relevant circumstances include, with respect to a person other than the issuer. [sic]
>
> (a) The type of issuer;
>
> (b) The type of security;
>
> (c) The type of person;
>
> . . . .
>
> (f) Reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in the light of the functions and responsibilities of the particular person with respect to the issuer and the filing);
>
> (g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant; and

> (h) Whether, with respect to a fact or document incorporated by reference, the particular person had any responsibility for the fact or document at the time of the filing from which it was incorporated.

17 C.F.R. § 230.176.

Although "[n]o court has ever been called upon to interpret Rule 176," the SEC's own commentary on the rule makes clear that Rule 176 did not alter the fundamental nature of underwriters' due diligence obligations. Langevoort, 63 Law & Contemp. Probs. at 65; *Task Force Report*, 48 Bus. Law. at 1210. At the time Rule 176 was finalized, the SEC took care to explain that integrated disclosure was intended to "simplify disclosure and reduce unnecessary repetition and redelivery of information," not to "modify the responsibility of underwriters and others to make a reasonable investigation." SEC Rel. 6335, 1981 WL 31062, at *10. Instead, emphasizing that "nothing in the Commission's integrated disclosure system precludes conducting adequate due diligence," the SEC advised underwriters concerned about the time pressures created by integrated disclosure to "arrange [their] due diligence procedures over time for the purpose of avoiding last minute delays in an offering environment characterized by rapid market changes." *Id.* It also reminded them that an underwriter is "never compelled to proceed with an offering *until he has accomplished his due diligence.*" *Id.* (emphasis supplied). And the SEC warned underwriters that the verification "required by the case law and contemplated by the statute" would still be required in appropriate circumstances. *Id.* at *10–

---

**46.** Academic assessments of Rule 176 have often observed that Rule 176 does not provide a safe harbor. *See, e.g.,* Donald C. Langevoort, *Deconstructing Section 11: Public Offering Liability in a Continuous Disclosure Envi-* *ronment*, 63 Law & Contemp. Probs. 45, 63 (2000) (Rule 176 does not furnish a "true safe harbor, providing immunity to underwriters who follow its guidelines.").

11. As recently as December 1998, the SEC recalled that it "expressly rejected the consideration of competitive timing and pressures when evaluating the reasonableness of an underwriter's investigation." 63 Fed.Reg. at 67231.

The SEC's intent to maintain high standards for underwriter due diligence is confirmed by its many discussions of appropriate due diligence techniques in the integrated disclosure system. In proposing Rule 176, the SEC acknowledged that different investigatory methods would be needed "in view of the compressed preparation time and the volatile nature of the capital markets." SEC Rel. 6335, 1981 WL 31062, at *11. Nonetheless, it emphasized that such techniques must be *"equally thorough."* *Id.* (emphasis supplied). Among the strategies recommended by the SEC were the development of a "reservoir of knowledge about the companies that may select the underwriter to distribute their securities registered on short form registration statements" through a "careful review of [periodic Exchange Act] filings on an ongoing basis," consultation of analysts' reports, and active participation in the issuer's investor relations program, especially analysts and brokers meetings. *Id.* at *11–12.

At the time the SEC finalized the shelf registration rule two years later, it again recognized that "the techniques of conducting due diligence investigations of registrants qualified to use short form registration ... would differ from due diligence investigations under other circumstances." SEC Rel. 6499, 1983 WL 408321, at *6. Nonetheless, it stressed the use of "anticipatory and continuous due diligence programs" to augment underwriters' fulfillment of their due diligence obligations. *Id.* Among other practices, the SEC approvingly noted the increased designation of one law firm to act as underwriters' counsel, which "facilitates continuous due diligence by ensuring on-going access to the registrant on the underwriters' behalf"; the holding of "Exchange Act report 'drafting sessions,'" which allow underwriters "to participate in the drafting and review of periodic disclosure documents before they are filed"; and "periodic due diligence sessions," such as meetings between prospective underwriters, their counsel, and management shortly after the release of quarterly earnings. *Id.*

In 1998, the SEC proposed expanding Rule 176 to "identify six due diligence practices that the Commission believes would enhance an underwriter's due diligence investigation when conducting an expedited offering." SEC Rel. 7606A, 63 Fed.Reg. at 67231. Among these six practices were the underwriter's receipt of a SAS 72 comfort letter. Yet the SEC emphasized that "these practices in no way constitute an exclusive list or serve as a substitute for a court's analysis of all relevant circumstances." *Id.* The 1998 proposal has never been finalized. Even if the proposed changes had been enacted, however, the SEC cautioned that "only a court can make the determination of whether a defendant's conduct was reasonable under all the circumstances of a particular offering." SEC Rel. 6335, 1981 WL 31062, at *13.

It must be noted that academics and practitioners alike have asserted that the current regime for underwriter liability under Section 11 no longer makes sense. Professor Coffee, for one, has observed that "it is not clear that the underwriter today still performs the classic gatekeeping function.... Many argue that serious due diligence efforts are simply not feasible within the time constraints of shelf registration. Given these constraints, they claim that the solution lies in downsizing

the threat under section 11." John C. Coffee, Jr., *Brave New World?: The Impact(s) of the Internet on Modern Securities Regulation,* 52 Bus. Law. 1195, 1211 (1997). Another professor has remarked that "there is a strong practical case to be made for absolving underwriters of all inquiry obligations short of recklessness.... As underwriter involvement diminishes in significance relative to the deal as a whole, it becomes that much more problematic to apply a negligence-based standard in the first place." Langevoort, 63 Law & Contemp. Probs. at 67. A third asserts that in today's capital markets, "it is reasonable to question whether the underwriter's 'due diligence' role is justified at all.... [F]or shelf registrations, disinterested advance due diligence is the exception not the rule." Frank Partnoy, *Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime,* 79 Wash. U.L.Q. 491, 522 (2001) (citation omitted) (*"Barbarians at the Gatekeepers"*).

In a related vein, a Task Force of experienced counsel to underwriters concludes that the "'integrated disclosure system' and the expansion of shelf registration statements have called into question whether underwriters any longer 'sponsor' an issue in a meaningful way, as opposed to delivering advice and distribution services." *Task Force Report,* 48 Bus. Law. at 1239. Similarly, the ABA Committee on Federal Regulation on Securities has complained to the SEC that

> [t]he benefits of 'on demand' financing ... are undermined by continuing to impose on financial intermediaries and other 'gatekeepers' the responsibility to take the time necessary to do a sufficient due diligence investigation to assure quality disclosure without recognizing and making allowances for their difficulty or even inability to do so. It is not possible for underwriters and

others to meet this standard in the current financing environment.

Letter from ABA Committee on Federal Regulation on Securities, Business Law Section, to David B.H. Martin, Director, Division of Corporation Finance, SEC, Aug. 22, 2001. Thus, academics and practitioners have called for a reexamination of underwriters' liability under Sections 11 and 12(a)(2) on the grounds that "Congress's assumptions in 1933 and 1934 about registrants working with individual underwriters in a relatively leisurely atmosphere are at odds with today's competition by multiple underwriters for high-speed transactions." *Id.* Implicit in these calls for a legislative change is the recognition that current law continues to place a burden upon an underwriter to conduct a reasonable investigation of non-expertised statements in a registration statement, including an issuer's interim financial statements.

### E. *Case Law: Reliance Defense*

Over thirty-five years ago, the Honorable Edward C. McLean of this District observed that "there is little or no judicial authority" on how a defendant can successfully establish his affirmative defenses under Section 11. *Escott v. BarChris Constr. Corp.,* 283 F.Supp. 643, 683 (S.D.N.Y. 1968). This remains true today. Neither the Supreme Court nor the Second Circuit has explored this area of law in any significant way. Justice Powell, however, reflected on the reliance defense in his dissent from the Court's denial of certiorari in *John Nuveen & Co. v. Sanders,* 450 U.S. at 1005, 101 S.Ct. 1719, a case addressed to the requirements of Section 12(a)(2)'s reasonable care defense. According to Justice Powell, Section 11

> explicitly absolve[s] [an underwriter] of the duty to investigate with respect to "any part of the registration statement purporting to be made on the authority

of an expert" such as a certified account-ant if "he had no reasonable ground to believe and did not believe" that the information therein was misleading. This provision is in the Act because, *almost by definition, it is reasonable to rely on financial statements certified by public accountants.*

*Id.* at 1010, 101 S.Ct. 1719 (emphasis sup-plied) (citation omitted). Justice Powell further explained that underwriters' reli-ance on certified financial statements is not only reasonable but also, in his view, "essential to the proper functioning of se-curities marketing, to the trading in secu-rities, to the lending of money by banks and financial institutions, and to the reli-ance by stockholders on the reports of their corporations." *Id.* n. 4, 101 S.Ct. 1719. He observed that "where breaches by accountants occur, it is the accountants themselves—not those who rely in good faith on their professional expertise—who are at fault and who should be held re-sponsible." *Id.; see also Worlds of Won-der,* 35 F.3d at 1421, *Software Toolworks,* 50 F.3d at 623; *Griffin v. PaineWebber, Inc.,* 84 F.Supp.2d 508, 512–13 (S.D.N.Y. 2000).

█ Nevertheless, underwriters' reli-ance on audited financial statements may not be blind. Rather, where "red flags" regarding the reliability of an audited fi-nancial statement emerge, mere reliance on an audit will not be sufficient to ward off liability.

The concept of red flags primarily ap-pears in cases arising under Section 10(b) of the Exchange Act. *See, e.g., LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003); *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996); *In re Ames Dep't Stores, Inc. Note Litig.,* 991 F.2d 968, 981 (2d Cir.1993); *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir.1984); *In re*

*Philip Servs. Corp. Sec. Litig.,* No. 98 Civ. 0835(MBM), 2004 WL 1152501, at *9–10 (S.D.N.Y. May 24, 2004); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 347 (S.D.N.Y.2004); *In re WorldCom Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 21488087, at *9 (S.D.N.Y. June 25, 2003); *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 334 (S.D.N.Y. 2001).

In these cases, the phrase "red flags" can be used to describe two different con-cepts. First, red flags can be those facts which come to a defendant's attention that would place a reasonable party in defen-dant's position "on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sun-terra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1333 (M.D.Fl.2002). In contrast to Section 11 and Section 12(a)(2) claims, which do not require a showing of scienter, in a Section 10(b) case, the plaintiff must suffi-ciently plead that the defendant acted with "an intent to deceive, manipulate or de-fraud." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (citation omitted). One way of meeting this standard is to allege facts showing that the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000) (citation omitted). Therefore, in an attempt to demonstrate recklessness, plaintiffs in Section 10(b) cases often assert that a defendant ignored "red warning flags" of another actor's wrongdoing. *Chill,* 101 F.3d at 269. *See also Philip Servs.,* 2004 WL 1152501, at *9; *Complete Mgmt.,* 153 F.Supp.2d at 334.

The phrase "red flags," or "storm warn-ings," may also describe facts or circum-

stances that "would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Frontier Ins.*, 318 F.3d at 154 (citation omitted); *see also Ames Dep't Stores*, 991 F.2d at 981, *Complete Mgmt.*, 153 F.Supp.2d at 337. The Second Circuit, for example, has found that a company's taking three substantial reserve charges over four years should have "alert[ed] any reasonable investor that something is seriously wrong." *Frontier Ins.*, 318 F.3d at 155. Where such red flags arise, a duty of inquiry arises and knowledge of the fraud is imputed to the investor with consequences as to whether or not a claim has been filed within the statute of limitations. *Id.* at 154; *see also* 15 U.S.C. § 78i(e).

While the existence of red flags is principally discussed in the Section 10(b) context, courts have also used this concept to inform their analysis of Section 11 claims. In *Software Toolworks*, 50 F.3d 615, for example, the plaintiffs asserted that the underwriter defendants were not entitled to "blindly rely" on the audited financial statements in light of "red flags" suggesting that the recognition of revenue for certain sales was improper. *Id.* at 623. Among other assertions, the plaintiffs alleged that the underwriter defendants' discovery of a memorandum that revealed the backdating of a sales contract so that Toolworks could recognize revenue in a particular fiscal year constituted a "red flag" that should have deprived the defendants of their reliance defense. *Id.* at 624. Finding that the underwriters demanded an explanation from the auditor about its accounting, insisted on written confirmations of particular contracts, and confirmed the auditor's accounting method with other accounting firms, the Ninth Circuit upheld the district court's holding that the underwriters' "investigation ... was reasonable" as a matter of law. *Id.* Nevertheless, it noted that "[i]f the Underwriters had done

nothing more" than simply discover the red flag, the plaintiffs' contention that the underwriter could no longer rely on the audit would be correct. *Id.*

 Given the difference between the contexts in which the term "red flag" is used, a particular fact that is deemed to constitute a red flag in a Section 10(b) claim may not be a red flag in a Section 11 inquiry, and *vice versa.* An example from *Mosesian*, 727 F.2d 873, may be instructive here. At trial, to support its argument that a Section 10(b) claim was time-barred, the auditor identified seven "red flag" events that it contended should have "alert[ed] a reasonably prudent investor of wrongdoing on [its] part." *Id.* at 877. The court rejected the auditor's argument, finding that a company's "[f]inancial problems ... do not necessarily suggest accounting fraud." *Id.* at 878. The court's conclusion in *Mosesian* does not mean, however, that financial problems cannot constitute red flags in Section 11 cases. Rather, as outlined above, in order to be entitled to the reliance defense under Section 11, a defendant must show that he had "no reasonable ground to believe and did not believe" that the statements within the registration statement that were made on an expert's authority were untrue. 15 U.S.C. 77k(b)(3)(C). Any information that strips a defendant of his confidence in the accuracy of those portions of a registration statement premised on audited financial statements is a red flag, whether or not it relates to accounting fraud or an audit failure. What is at stake under Section 11 is not an auditor's scienter, but the accuracy and completeness of the statements in the registration statement.

It is equally important to note that what constitutes a red flag depends on the facts and context of a particular case. For instance, this Circuit asserted in a recent

Section 10(b) case that its determination of whether storm warnings exist would "depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." *Frontier Ins.*, 318 F.3d at 155. In a similar vein, "[t]he question of what a reasonably prudent [man] should have known is particularly suited to a jury determination." *Mosesian*, 727 F.2d at 879.

### F. Case Law: Due Diligence Defense

 Just as there is little judicial elaboration of the reliance defense, so too there is "little judicial gloss" on the due diligence defense afforded to underwriters for non-expertised portions of a registration statement. *Feit*, 332 F.Supp. at 576. *See also Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir.1996) ("The law on due diligence is sparse...."); John C. Coffee, Jr., *A Statutory and Case Law Primer on Due Diligence Under the Securities Law*, 886 P.L.I./Corp 11, 17 (1995) ("Few decisions have wrestled with the concepts in §§ 11(b) and 11(c)."); Joseph McLaughlin, *Some Challenges to Underwriters and Their Counsel in the Modern Capital Markets Environment*, 28 Wake Forest L.Rev. 61, 67 (1993) (noting "relative paucity of judicial interpretations of the underwriters' 'due diligence' defense"); Partnoy, *Barbarians at the Gatekeepers*, 79 Wash. U.L.Q. at 514 (2001) (Section 11 due diligence defense has generated "little case law."). While there is a paucity of caselaw, "two early cases," *Escott v. BarChris Construction Corp.*, 283 F.Supp. at 643, and *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. at 544, "remain the major polestars" in defining what constitutes a reasonable investigation. Coffee, 886 P.L.I./Corp. at 17 (citation omitted).

Faced with "no judicial decision defining the degree of diligence which underwriters must exercise to establish their defense under Section 11," in 1968, the *BarChris* court contemplated whether "it is sufficient [for an underwriter] to ask questions, to obtain answers which, if true, would be thought satisfactory, and to let it go at that, without seeking to ascertain from the records whether the answers in fact are true and complete." *BarChris*, 283 F.Supp. at 696. The lead underwriter or its counsel read annual reports and prospectuses of other companies within the industry; perused the issuer's prior prospectuses, annual reports, and most recent unaudited interim financial statements, as well as its minutes from the previous five years and its major contracts; and attended several meetings with the issuer at which underwriter and underwriters' counsel asked "pertinent questions and received answers which satisfied them" and in which "extensive, successive proofs of the prospectus were considered and revised." *Id.* at 693–95.

Rendering his opinion following a bench trial, Judge McLean noted the impossibility of establishing "a rigid rule suitable for every case defining the extent to which such verification must go. It is a question of degree, a matter of judgment in each case." *Id.* at 697 (emphasis supplied). Nonetheless, he held the underwriters had not conducted a "reasonable investigation of the truth of those portions of the prospectus which were not made on the authority of [the auditor] as an expert" because they made "almost no attempt to *verify* management's representations." *Id.* at 697 (emphasis supplied). In determining that an underwriter's due diligence obligations include efforts to verify information supplied by the issuer, the *BarChris* court relied heavily on the purpose of Section 11 and underwriters' role within

the statutory scheme. As Judge McLean observed,

> The purpose of Section 11 is to protect investors. To that end the underwriters are made responsible for the truth of the prospectus. If they may escape that responsibility by taking at face value representations made to them by the company's management, then the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection. To effectuate the statute's purpose, the phrase "reasonable investigation" must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of "data presented" to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believe that the company's officers are truthful and reliable. In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them. They may not rely solely on the company's officers or on the company's counsel. A prudent man in the management of his own property would not rely on them.

*Id.*

Three years later, the Honorable Jack B. Weinstein further expounded on the due diligence defense in *Feit*, 332 F.Supp. at 544. Like the *BarChris* opinion before it, which refused to set forth a "rigid rule" for reasonable investigation, *Feit* insists that "[w]hat constitutes 'reasonable investigation' and a 'reasonable ground to believe' will vary with the degree of involvement of the individual, his expertise, and his access to the pertinent information and data." *Id.* at 577. Yet *Feit* places great emphasis on the underwriters' role in a securities offering, observing that "the underwriter is the only participant in the registration process who, as to matters not certified by the accountant, is able to make the kind of investigation which will protect the purchasing public." *Id.* at 581 (citation omitted).

Given the underwriter's independence from the issuer, Judge Weinstein affirmed that while an underwriter is not "expected to possess the intimate knowledge of corporate affairs of inside directors," his obligation is to conduct a meaningful investigation, "not merely ... listen[ ] to management's explanations of the company's affairs." *Id.* at 581–82 (citation omitted). "Tacit reliance on management assertions is unacceptable; the underwriters must play devil's advocate." *Id.* at 582 (citation omitted). Rendering his decision following a bench trial, Judge Weinstein found that the *Feit* underwriters had "just barely" satisfied this standard by completing a "thorough review of all available financial data," including an examination of the issuer's audit, "searching inquiries" of the issuer's major bank, and a study of the issuer's corporate minutes, records, and major agreements; attending due diligence meetings at which the proposed registration statement was reviewed "line by line"; reviewing correspondence pertinent to the omission at issue; and remaining in "constant contact" with the issuer. *Id.* at 582–83.

The years following *BarChris* and *Feit* have been marked by considerable change in the regulatory framework governing securities registration. Specifically, short-form registration, the expansion of shelf registration, and Rule 176 were each introduced well after these two cases were decided. Recent Section 11 case law, however, shows no signs of abandoning the early courts' demand that underwriters employ

"a high degree of care in investigation and independent verification of the company's representations." *Feit,* 332 F.Supp. at 582.

The most prominent recent discussion of an underwriter's due diligence obligation appears in *Software Toolworks,* 50 F.3d at 615. In *Software Toolworks,* the Ninth Circuit partially affirmed a decision granting summary judgment to the underwriter defendants on the basis of their due diligence defense, specifically, that they had sufficiently investigated the issuer's business with Nintendo. In conducting that investigation, the underwriters obtained written representations from the auditor and issuer as to the prospectus's accuracy, confirmed the issuer's return policy with its customers, and surveyed retailers regarding pricing and other relevant details. *Software Toolworks,* 50 F.3d at 622–23. The *Software Toolworks* court reversed the district court's grant of summary judgment with respect to other aspects of the underwriters' due diligence efforts. Notably, it found that there were questions of fact as to whether underwriters performed adequate due diligence on the issuer's post-prospectus entry of $7 million in large consignment sales, which were later reversed in the final financial statements for the quarter. *Id.* at 626. Rather than play's "devil's advocate," as *Feit* requires an underwriter to do, the *Software Toolworks* underwriters "did little more than rely on Toolworks' assurances that the transactions were legitimate," making summary judgment in their favor inappropriate. *Id.*

The Honorable Robert W. Sweet of this District, citing *Feit,* asserted in 1993 that "reasonably due diligence will normally involve a *careful* review of the issuer's financial statements and important contracts." *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959(RWS), 90 Civ. 5056(RWS), 1993 WL 362364, at *19 (S.D.N.Y. Sep. 17, 1993) (emphasis supplied). The court denied summary judgment for the underwriter defendant, which had argued that it was entitled to rely upon the interim financial statements despite having not performed "line-by-line scrutiny" of the same. *Id.* at *21. While acknowledging that a "private placement agent need not duplicate accounting procedures in evaluating a firm," the court found that the underwriter's inquiries as to certain major contracts and its reliance on the interim financial statements presented factual issues as to the adequacy and reasonableness of its due diligence investigation. *Id.*

Where district courts have granted summary judgment for underwriters in recent years, the underwriters have demonstrated extensive due diligence efforts. As one court recounted in granting summary judgment,

> The underwriters had over twenty meetings with various management personnel, covering all aspects of the company's business. Company personnel were specifically questioned about the development and scheduled availability of products, related operating systems and applications software. The underwriters also contacted many of [the issuer's] suppliers, customers, and distributors, who were asked extensive questions about the company's operations. The underwriters reviewed company documents including operating plans, product literature, corporate records, financial statements, contacts, and lists of distributors and customers. They examined trade journals and other industry-related publications to ascertain industry trends, market trends and competitive information.... *When any negative or questionable information was developed as a result of their investigation, the underwriters discussed it with the ap-*

*propriate persons and arrived at informed decisions and opinions.*

*Weinberger v. Jackson,* No. C–89–2301–CAL, 1990 WL 260676, at *3 (N.D.Cal. Oct.11, 1990), 1999 U.S. Dist. LEXIS 18394, at *7–8 (emphasis supplied). Another court granted summary judgment for the underwriter defendant only after establishing that the underwriters conducted an "unquestionably extensive" investigation. *In re Int'l Rectifier Sec. Litig.,* No. CV91–3357–RMT(BQRX), 1997 WL 529600, at *3 (C.D.Cal.1997), 1997 U.S. Dist. LEXIS 23966, at *7. Among other things, their diligence included a review of the issuer's "internal financial forecasts, contracts, and other important documents"; interviews of the issuer's major customers, outside quality consultants, attorneys, auditor, and nearly a dozen of the issuer's managers; "written verification from [the issuer's] management that the information in the prospectus was correct"; and "a 'cold comfort' letter from [the issuer's] outside accountants indicating that there had been no material changes in [the issuer's] financial position since its last audit." *Id.* at *8, 1997 U.S. Dist. LEXIS 23966, at *20–21.

Similarly, the court in *Phillips v. Kidder, Peabody & Co.,* 933 F.Supp. 303 (S.D.N.Y.1996), *aff'd,* 108 F.3d 1370, 1997 WL 138814 (2d Cir.1997), found that the underwriter defendant had conducted extensive due diligence, which included "reviewing the [issuer's] financial statements, forecasts, budgets, and accounting controls, including discussions and/or meetings with management, outside directors, accountants, suppliers, and lending banks." *Phillips,* 933 F.Supp. at 318. Moreover, although the underwriters "relied in large part on the cold comfort letters provided by Arthur Andersen," those comfort letters did not concern unaudited interim financial information. *Id.* at 323. Rather, the detailed comfort letter in *Phillips* re-

cited specific steps taken to confirm the adequacy of the issuer's internal inventory and accounting controls in the wake of a major supplier's reduction of prices on certain products, and was only one part of the underwriters' due diligence on the issue of inventory shrinkage. *Id.* at 319 n. 11.

■ Thus, courts have continued to insist that underwriters demonstrate that they have conducted a meaningful investigation before granting summary judgment. That includes a reasonable investigation of unaudited financial information. *See Glassman,* 90 F.3d at 629 ("[A] failure by the underwriters either to verify a company's statements as to its financial state or to consider new information up to the effective date of an offering would almost certainly constitute a lack of due diligence."). In addition, an underwriter conducting a due diligence investigation must "look deeper and question more" where confronted with red flags. *Enron,* 235 F.Supp.2d at 707; *see also Univ. Hill Found. v. Goldman, Sachs & Co.,* 422 F.Supp. 879, 900 (S.D.N.Y.1976) (whether or not underwriter conducted "reasonable investigation" depends on "the presence or absence of 'warning signals' to [underwriter] that something more might be in order.") (citation omitted).

While none of these courts have employed principles of statutory construction to reach their holdings, our role here, as always, is "to interpret the language of the statute enacted by Congress." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 461, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Such statutory interpretation must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,* 541 U.S. 246, 124 S.Ct. 1756, 1761,

158 L.Ed.2d 529 (2004) (citation omitted). In the Section 11 context, this presumption is heightened by the fact that "in the securities Acts Congress has used its words with precision." *Nuveen,* 450 U.S. at 1009, 101 S.Ct. 1719 (Powell, J., dissenting from denial of cert.).

Section 11(b) plainly commands that underwriters conduct an *investigation* as to portions of a registration statement not made on the authority of an expert. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). Today, as in 1933 when Section 11 became law, the word "investigation" connotes a "thorough" or "searching inquiry." *Compare* Webster's New International Dictionary of the English Language 1306 (2d ed. 1934) ("Webster's 1934") *with* Webster's Third New International Dictionary of the English Language 1189 (1993) ("Webster's 1993"). Then and now, it can also mean the process of investigating. *See* Webster's 1934 at 1306; Webster's 1993 at 1189. Under this latter definition, an investigation is no less demanding, as the word "investigate" is defined as "to inquire and examine into with systematic attention to detail and relationship." Webster's 1934 at 1306; *see also* Webster's 1993 at 1189 ("to inquire into systematically.")

## G. *The Application of the Law to This Motion*

The Underwriter Defendants have moved for summary judgment on each of the alleged misstatements in the 2000 and 2001 Registration Statements. The Underwriter Defendants analyze each of the misstatements (as opposed to the omissions) that the Lead Plaintiff has alleged as quintessentially matters of accounting. Most of the misstatements are financial figures from WorldCom's Exchange Act reports that were incorporated by reference into the Registration Statements. Additional misstatements include management's comparison of financial figures from one period to the next, statements by WorldCom's management describing accounting policies and future expectations, and the use of proceeds. The Underwriter Defendants contend that they are entitled to summary judgment on their affirmative defenses of reliance and due diligence because they were entitled to rely on Andersen's audits and comfort letters. The analysis that follows distinguishes between the expertised and non-expertised statements which are the subject of this motion.

### 1. *Audited Financial Statements*

The Underwriter Defendants contend that they were entitled to rely on Andersen's unqualified "clean" audit opinions for WorldCom's 1999 and 2000 Form 10–Ks as expertised statements under Section 11(b)(3)(C). Their motion for summary judgment on their reliance defense is denied.

### a. *2000 Registration Statement*

The Lead Plaintiff points to one issue that it contends gave the Underwriter Defendants a reasonable ground to question the reliability of WorldCom's 1999 Form 10–K. According to the computations presented by the Lead Plaintiff, WorldCom's reported E/R ratio was significantly lower than that of the equivalent numbers of its two closest competitors, Sprint and AT & T.[47] The Lead Plaintiff argues that, in the extremely competitive market in which WorldCom operated, that discrepancy trig-

---

**47.** WorldCom's E/R ratio was 43%. The expert for the Lead Plaintiff calculates that AT & T's equivalent ratio was 46.8% and Sprint's was 53.2%.

gered a duty to investigate such a crucial measurement of the company's health. The Lead Plaintiff has shown that there are issues of fact as to whether the Underwriter Defendants had reasonable grounds to believe that the 1999 Form 10–K was inaccurate in the lines related to the E/R ratio reflected in that filing.

The Underwriter Defendants argue that the difference in the E/R ratios was insufficient as a matter of law to put the Underwriter Defendants on notice of any accounting irregularity. In support of this, they point to the fact that this difference was publicly available information and no one else announced a belief that it suggested the existence of an accounting fraud at WorldCom.

The fact that the difference was publicly available information does not absolve the Underwriter Defendants of their duty to bring their expertise to bear on the issue. The Underwriter Defendants do not dispute that they were required to be familiar with the Exchange Act filings that were incorporated by reference into the Registration Statement. If a "prudent man in the management of his own property," 15 U.S.C. § 77k(c), upon reading the 1999 Form 10–K and being familiar with the other relevant information about the issuer's competitors would have questioned the accuracy of the figures, then those figures constituted a red flag and imposed a duty of investigation on the Underwriter Defendants. A jury would be entitled to find that this difference was of sufficient importance to have triggered a duty to investigate the reliability of the figures on which the ratio was based even though the figures had been audited.

The Underwriter Defendants contend that an audited figure can never constitute a red flag and impose a duty of investigation. This argument mischaracterizes the Lead Plaintiff's position. The Lead Plaintiff has pointed to facts extraneous to WorldCom's audited figures to argue that a reasonable person would have inquired further about the discrepancy between the audited figures and the comparable information from competitors.[48] As discussed above, the existence of red flags can create a duty to investigate even audited financial statements.

The Underwriter Defendants argue that the standard that should apply is whether they had "clear and direct notice" of an "accounting" problem. They argue that case law establishes that "ordinary business events" do not constitute red flags. They are wrong. There is no basis in law to find a requirement that a red flag arises only when there is "clear and direct" notice of an accounting issue. The standard under Section 11 is whether a defendant has proven that it had "no reasonable ground to believe and did not believe" that a registration statement contained material misstatements, a standard given meaning by what a "prudent man" would do in the management of his own property. Nor is the bar lowered because there is an expert's opinion on which an underwriter is entitled to rely. The "prudent man" standard applies to Section 11(b)(3)(C). Finally, what constitutes an ordinary business event and what constitutes a red flag is an issue of fact. These are exquisitely fact intensive inquiries that depend on the circumstances surrounding a particular issuer and the alleged misstatement. There

---

**48.** The Underwriter Defendants assert that they were extremely knowledgeable about the telecommunications industry and had a sophisticated understanding of it and World-Com's place within that industry due to their continuous due diligence over the years. They do not deny that they were, and were required to be, in a position to understand and analyze the significance of a variation in E/R ratios.

is no category of information which can always be ignored by an underwriter on the ground that it constitutes an ordinary business event. What is ordinary in one context may be sufficiently unusual in another to create a duty of investigation by a "prudent man."

In their analysis of the E/R ratio discrepancy itself, the Underwriter Defendants contend that a difference in ratios is not necessarily suspicious in a competitive industry and that the Lead Plaintiff's expert has incorrectly calculated the comparable ratios for AT & T and Sprint.[49] Each of these arguments raises questions of fact that must be resolved at trial.

### b. 2001 Registration Statement

The Lead Plaintiff points to three issues that it contends imposed upon the Underwriter Defendants a duty to investigate the reliability of WorldCom's 2000 Form 10–K. They are the discrepancy between WorldCom's E/R ratio and that of its competitors; the deterioration in the MCI long-distance business, which the Lead Plaintiff alleges should have caused them to question the accuracy of WorldCom's reported assets;[50] and Ebbers' personal financial situation, which gave him both the motive and opportunity to inflate WorldCom's stock price through manipulation.

The Underwriter Defendants' general arguments about the nature of the reliance defense insofar as it concerns audited information have already been addressed. The arguments that are particular to the

individual red flags identified by the Lead Plaintiff are addressed below. The Underwriter Defendants have shown that they are entitled to summary judgment on the issue of whether Ebbers' financial situation constituted a red flag that imposed upon them the duty of inquiry.

### i. Goodwill and Asset Impairment

The Underwriter Defendants make several arguments concerning the issue of goodwill and asset impairment. They contend that it was public knowledge that AT & T and Sprint took asset impairment charges to their core networks in 2000 while WorldCom did not, that the telecommunications sector was in decline, and that analysts had described the equity value of the MCI tracking stock as close to zero. To the extent that these arguments are meant to suggest that bondholders cannot show that they relied on any misstatement in the WorldCom financials, there is no requirement of such a showing under either Section 11 or Section 12(a)(2). Furthermore, the issue in connection with the reliance defense is not whether the red flag information was well known, but whether the red flags existed and imposed a duty upon the Underwriter Defendants under the "prudent man" standard to inquire of WorldCom and/or Andersen about the reporting of WorldCom's assets because the Underwriter Defendants had a reasonable ground to believe that the reporting of assets may have been inaccurate.

---

**49.** The Underwriter Defendants contend that the Lead Plaintiff's expert has included costs AT & T and Sprint incurred to operate their own lines, while WorldCom's E/R ratio is based solely on the amount it pays to others for access to lines. In their reply brief, the Underwriter Defendants represent that Lead Plaintiff's expert calculates that the line costs for 1999 were understated by $60 million,

which would have had a minimal effect on the E/R ratio. They argue that this discrepancy was not material. Arguments made for the first time in reply will not be considered.

**50.** When WorldCom acquired MCI for $47 billion, $29 billion of that purchase price was attributed to goodwill, which is treated as an intangible asset.

The Underwriter Defendants next contend that WorldCom's treatment of the accounting issue was defensible.[51] The Underwriter Defendants may be able to establish at trial that there was no misrepresentation of WorldCom's assets, but they have not moved for summary judgment on that ground. Instead, they have moved for summary judgment on their reliance defense by arguing that they had no duty to make any inquiry regarding the accuracy of WorldCom's statement of its assets. The Lead Plaintiff has shown that there are issues of fact regarding WorldCom's statement of its assets that a jury may find raised a red flag and imposed upon the Underwriter Defendants the obligation to inquire.

### ii. Ebbers' Personal Finances

■ The Underwriter Defendants are entitled to summary judgment on the issue of whether Ebbers' personal financial situation, and in particular the extent to which his wealth was dependent on WorldCom's stock price, imposed upon them an obligation to inquire. The Lead Plaintiff has shown that the Underwriter Defendants were well aware of the complexity of Ebbers' personal finances and the extraordinary extent to which those finances were dependent on the movement in WorldCom's stock price. They had access to information which painted a much starker picture in this regard than the public record. The Lead Plaintiff has also shown that the Underwriter Defendants should have understood that Ebbers was in a position to affect the integrity of WorldCom's financial reporting. What the Lead Plaintiff has not shown is that the Underwriter Defendants had any reason to believe that Ebbers would use his access and power to commit fraud.

The "motive and opportunity" cases that arise in the context of Section 10(b) of the Exchange Act have limited relevance here. The issue under Section 10(b) is whether a plaintiff has adequately pleaded an officer's motive and opportunity to engage in fraud such that the defendant's scienter has been adequately alleged. See, e.g., Acito v. IMCERA Group, 47 F.3d 47, 54 (2d Cir.1995). The issue here is whether the Underwriter Defendants' knowledge of Ebbers, including his financial circumstances, gave them reason to believe the WorldCom audited financial statements were inaccurate. Without some evidence that the Underwriter Defendants had reason to believe that Ebbers was untrustworthy, his dependence on WorldCom's financial health, even though extraordinary, is insufficient to constitute a red flag that he may have caused a manipulation of WorldCom's financial statements.

### iii. E/R Ratio

The Underwriter Defendants rely on many of the arguments that they made regarding the E/R ratio in connection with the 2000 Registration Statement. The Lead Plaintiff has shown that there are issues of fact as to whether the discrepancy in the WorldCom E/R ratio, when compared to comparable companies' E/R ratios, was sufficient to cause a prudent man to make an inquiry regarding the accuracy of the 2000 Form 10–K.

### 2. Interim Financial Statements

■ The Underwriter Defendants contend that, pursuant to Sections 11(b)(3)(A) and 12(a)(2), they were entitled to rely on Andersen's comfort letters for WorldCom's

---

**51.** The Underwriter Defendants principally rely on a reading of correspondence between WorldCom and the SEC regarding World-Com's use of a forty-year useful life depreciation curve for goodwill and industry practice.

unaudited interim financial statements for the first quarter of 2000 and 2001 so long as the Lead Plaintiff is unable to show that the Underwriter Defendants were on notice of any accounting red flags. They argue that this statement of the due diligence defense is particularly appropriate because WorldCom was a seasoned issuer and the Registration Statements were part of the integrated disclosure system that allowed the Exchange Act periodic reports to be incorporated by reference. The Underwriter Defendants contend that "Form S–3 issuers" like WorldCom are only required to include transaction-related information in a Form S–3 prospectus and that the information contained in the Exchange Act filings which are incorporated by reference do not need to be repeated. They argue that in the context of integrated disclosure for shelf registrations, and as a result of SEC Rule 176, the focus is on an underwriter's continuous learning about an "industry" and reasonable reliance on other professionals, such as an issuer's auditor. As a consequence, they contend that there is no difference from the point of view of the underwriter between audited and unaudited financial statements so long as the underwriter receives an auditor's comfort letter. According to the Underwriter Defendants, so long as there are no red flags that bring the auditor's assessment into question, the receipt of a comfort letter "goes a long way to establish" due diligence with respect to all matters of accounting. They ask for a legal ruling that "an underwriter's investigation of accounting issues is reasonable when it rests on the independent auditor's SAS 71 review for interim financial statements," at least in the context of seasoned issuers engaged in a shelf registration. Finally, they argue that it is material that no amount of reasonable diligence could have uncovered the capitalization of line costs since the WorldCom management deliber-ately concealed it from Andersen and every other outsider and would never have given them any documents or information that would have revealed the fraud.

Andersen issued a May 19 comfort letter and May 23 bringdown comfort letter for the 2000 Offering. Andersen issued comfort letters on May 9 and 16 for the 2001 Offering. These comfort letters addressed the only interim financial statements that were incorporated by reference in the Registration Statements. In connection with the latter Offering, the Underwriter Defendants emphasize that J.P. Morgan and SSB had recently had occasion to work closely with WorldCom on other projects. The two firms had participated in the two tracking stock realignment of WorldCom announced in November 2000, and J.P. Morgan had acted as a lead manager and sole book-runner for WorldCom's $2 billion private placement in December 2000. They point to these activities as part of their continuous due diligence for WorldCom.

To prevail on their due diligence defense at trial, the Underwriter Defendants must show that they conducted a reasonable investigation and that after such an investigation that they had reasonable ground to believe that the statements in the Registration Statements, including the information in the unaudited interim financial statements, were true. *See* 15 U.S.C. § 77k(b)(3)(A). In judging that investigation, a jury will have to consider the non-exclusive list of factors enumerated in Rule 176. Insofar as Rule 176 is concerned, there does not appear to be any dispute that WorldCom was a "well-established" issuer, that the notes at issue were investment-grade debt securities, that SSB and J.P. Morgan assigned experienced personnel to the due diligence teams, that they spoke to the issuer's CFO and in 2001 also spoke to Andersen, that the underwriting

was a firm commitment underwriting, that the underwriting was through a shelf registration, that many analysts and credit reporting agencies followed and reported on WorldCom, that the issuer and not the Underwriter Defendants had responsibility for preparing the interim financial statements, and that Andersen and not the Underwriter Defendants had responsibility for reviewing the interim financial statements.

The Lead Plaintiff has shown that there are questions of fact, however, as to whether the Underwriter Defendants conducted a reasonable investigation in either 2000 or 2001. It points to what it contends is evidence of the limited number of conversations with the issuer or its auditor, the cursory nature of the inquiries, the failure to go behind any of the almost formulaic answers given to questions, and the failure to inquire into issues of particular prominence in the Underwriter Defendants' own internal evaluations of the financial condition of the issuer or in the financial press. It argues in particular with respect to 2001, that having internally downgraded WorldCom's credit rating and having taken steps to limit their exposure as WorldCom creditors, the Underwriter Defendants were well aware that WorldCom was in a deteriorating financial position in a troubled industry, and that a reasonable investigation would have entailed a more searching inquiry than that undertaken by the Underwriter Defendants. Given the enormity of these two bond offerings, and the general deterioration in WorldCom's financial situation, at least as of the time of the 2001 Offering, they argue that a particularly probing in-

quiry by a prudent underwriter was warranted. These issues of fact require a jury trial.[52]

The Underwriter Defendants have framed their summary judgment motion in a way that is incompatible with their burden of proving their due diligence defense under Section 11. They seek to restrict the inquiry on their due diligence solely to the work undertaken with respect to the interim financial statements and therefore to restrict it to a determination of whether any red flags existed that would put them on notice of a duty to make an inquiry of the interim financial statements. This formulation converts the due diligence defense into the reliance defense and balkanizes the task of due diligence.

In order to succeed with a due diligence defense, the Underwriter Defendants will have to show that they conducted a reasonable investigation of the non-expertised portions of the Registration Statements and thereafter had reasonable ground to believe that the interim financial statements were true. In assessing the reasonableness of the investigation, their receipt of the comfort letters will be important evidence, but it is insufficient by itself to establish the defense.

It is important to note that even if no reasonable investigation would have uncovered a fraud, an underwriter will prevail on its defense if can show it did conduct a reasonable investigation. Conversely, an underwriter must conduct a reasonable investigation to prevail on the due diligence defense, even if it appears that such an investigation would have proven futile in uncovering the fraud. Without a reason-

---

**52.** To the extent that the Lead Plaintiff seeks to find an issue of fact from the differences between the comfort letters provided in 2000 and 2001, that argument does not seem particularly strong. The 2001 Registration Statement incorporated WorldCom's Form 8–K for the first quarter of 2001, while the 2000 Registration Statement incorporated Worldcom's Form 10–Q for the first quarter. The Underwriter Defendants appear to have shown that in 2001 Andersen gave the appropriate form of comfort letter for a Form 8–K.

able investigation, of course, it can never be known what would have been uncovered or what additional disclosures would have been demanded.

The Underwriter Defendants argue that if they are not entitled to rely on a comfort letter, the costs of capital formation in the United States will be substantially increased since underwriters will have to hire their own accounting firms to rehash the work of the issuer's auditor. Nothing in this Opinion should be read as imposing that obligation on underwriters or the underwriting process. The term "reasonable investigation" encompasses many modes of inquiry between obtaining comfort letters from an auditor and doing little more, on one hand, and having to re-audit a company's books on the other. Nonetheless, if aggressive or unusual accounting strategies regarding significant issues come to light in the course of a reasonable investigation, a prudent underwriter may choose to consult with accounting experts to confirm that the accounting treatment is appropriate and that additional disclosure is unnecessary. *See Software Toolworks*, 50 F.3d at 624.

Underwriters perform a different function from auditors. They have special access to information about an issuer at a critical time in the issuer's corporate life, at a time it is seeking to raise capital. The public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed.[53] Acting with the degree of diligence that applies to a prudent man when managing his own property, underwriters should ask those questions and seek those answers that are appropriate in the circumstances. They are not being asked to duplicate the work of auditors, but to conduct a reasonable investigation. If their initial investigation leads them to question the accuracy of financial reporting, then the existence of an audit or a comfort letter will not excuse the failure to follow through with a subsequent investigation of the matter. If red flags arise from a reasonable investigation, underwriters will have to make sufficient inquiry to satisfy themselves as to the accuracy of the financial statements, and if unsatisfied, they must demand disclosure, withdraw from the underwriting process, or bear the risk of liability.

An underwriter should, and the Underwriter Defendants here certainly did, have the "business and financial expertise to identify the weak points in an issuer's business and financial condition and to assess the adequacy of an issuer's disclosure in this regard." *Task Force Report*, 48 Bus. Law. at 1222. It is in part because underwriters have taken their responsibilities seriously in this regard that, from the perspective of over seventy years, the Securities Act has been an effective instrument of regulation. The question the jury will have to decide here is whether the Underwriter Defendants have fulfilled that obligation in the context of the two World-Com Offerings.

The Underwriter Defendants contend that they will be able to show at trial that the continuous due diligence that they performed with respect to WorldCom amounted to a reasonable investigation for both Offerings. This Opinion does not address the likelihood of that showing because the Underwriter Defendants have not moved for summary judgement on that ground. For that reason, it is also unnecessary to

---

**53.** Reflecting on underwriters' role as the procurer and verifier of critical issuer-specific information, some academic commentators describe them as "reputational intermediaries" or "gatekeepers." *See, e.g.,* John Coffee, *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms,* 84 B.U. L.Rev. 301, 302 n. 1, 308 nn. 13–14 (2004).

address their arguments about the difficulty of meeting the traditional standard for due diligence in the context of integrated disclosure and shelf registrations. In any event, the Underwriter Defendants have not shown that the prudent man standard in Section 11 has been diluted by any regulatory changes. The processes through which and the timing in which due diligence is performed have changed, but the ultimate test of reasonable conduct in the specific circumstances of an offering remains unchanged.

## IV. *The Underwriter Defendants' Motion for Summary Judgment: Omissions*

The Underwriter Defendants have also moved for summary judgment on each of the omissions from the Registration Statements that underlie the Securities Act claims. The alleged omissions are numerous. The Lead Plaintiff has identified twenty omissions from the 2000 Registration Statement, and forty-two from the 2001 Registration Statement.[54] The Underwriter Defendants have shown that they are entitled to summary judgment on some of these alleged omissions.

## A. *2000 Registration Statement*

The identified omissions from the 2000 Registration Statement are that it:

1. Failed to disclose WorldCom's lack of a strategic plan if the Sprint merger failed, leaving the Company without a wireless business.

2. Failed to disclose WorldCom's serious problems with obtaining the requisite regulatory approvals for the Sprint merger, including the fact that on May 18, 2000, a committee of the Department of Justice recommended that the Department block the merger.

3. Failed to disclose adequately that WorldCom was experiencing continued difficulty with its MCI long-distance business segment.

4. Failed to disclose adequately that the proliferation of new competitors in the voice long-distance business was having a negative impact on WorldCom's revenue and cash generation.

5. Failed to disclose adequately that the WorldCom Group's stated plan of focusing on high-growth data and Internet segments was almost entirely dependent on the Company's ability to stabilize cash flows in its long-distance business.

6. Failed to disclose the extent to which consumer and wholesale long-distance revenue was declining and was expected to decline.

7. Failed to disclose adequately that, while the Company intended to increase revenues by focusing on providing data services, this segment of WorldCom's business required large infusions of capital.

8. Failed to disclose adequately that WorldCom's future performance was contingent upon the success of its data and IP [Internet portal] initiatives.

9. Failed to disclose that certain of the Underwriter Defendants suffered from conflicts of interest that affected their ability to conduct a reasonable due diligence investigation in connection with the May 2000 Offering, including the following:

a. The fact that WorldCom selected the Underwriter Defendants for the May 2000 Offering based, at least in part, on the amount of credit that the Underwriter

---

54. This list is taken from the June 4, 2004 Response by the Lead Plaintiff to the Underwriter Defendants' Second Set of Interrogatories. On June 14, 2004, the Lead Plaintiff supplemented that response. The June 14 document principally adds detail for some of the items in the June 4 document.

Defendants' commercial banking affiliates agreed to extend to WorldCom, rather than on the basis of merit;

b. The fact that WorldCom selected the Underwriter Defendants for the May 2000 Offering based, at least in part, on the ratings that the Underwriter Defendants' research analysts had provided WorldCom;

c. The fact that certain of the Underwriter Defendants, and their corporate affiliates, extended millions of dollars in loans to WorldCom's CEO Bernie Ebbers in exchange for WorldCom's investment banking business; and

d. The fact that Salomon Smith Barney allocated numerous shares of initial public offering[s] to WorldCom officers and directors—enabling them to make millions of dollars in risk-free profits—in exchange for WorldCom's investment banking business.

10. Failed to include a risk factor section, despite the fact that WorldCom's business was facing a number of significant risks.

11. Failed to disclose that Ebbers was encumbered with a staggering amount of personal debt—much of which was extended by certain of the Underwriter Defendants and their affiliates and much of which was guaranteed by Ebbers' WorldCom shares—such that he faced personal financial ruin if the price of WorldCom stock dropped.

12. Failed to disclose the numerous outside business ventures in which Ebbers was involved, in addition to what was supposed to be his full-time job as WorldCom's CEO, and that he undoubtedly was distracted by the demands of those other businesses.

13. Failed to disclose the lack of any meaningful internal accounting controls at WorldCom.

14. Failed to disclose the lack of Board oversight at WorldCom, including the Board's failure to carefully consider large corporate transactions and its abdication of authority to Ebbers and Sullivan.

15. Failed to disclose that personnel assigned by the Underwriter Defendants to conduct due diligence on the Company were not able to form a view about what events or conditions were material to WorldCom.

16. Failed to disclose that the Underwriter Defendants had failed to conduct a reasonable investigation to determine whether WorldCom had the ability to service the debt it was assuming in the May 2000 Offering.

17. Failed to disclose that the audit committee of WorldCom's Board of Directors was not actively involved in discharging its duty to oversee the auditing of the Company's financial statements.

18. Failed to disclose that WorldCom provided significantly less financial information regarding its business segments to the public than its competitors.

19. Failed to disclose the lack of meaningful debt planning by the Company or its advisors, including the lack of analysis to assess whether the Company could maintain the debt it incurred.

20. Failed to disclose that WorldCom's acquisition of SkyTel Communications ("SkyTel") had not been properly considered by WorldCom's Board and that it was not a sound business decision.

The Underwriter Defendants seek summary judgment on all of these purported material omissions. The Lead Plaintiff opposes summary judgment with respect to three groups of the listed omissions from the 2000 Registration Statement: the Sprint merger, the conflicts of interest, and risk factors. The last category en-

compasses several of the separately listed omissions. Because the Lead Plaintiff has not addressed the Underwriter Defendants' arguments in support of summary judgment on omission items 12–18, and 20, summary judgment is granted with respect to them. Summary judgment is denied on the items related to the remaining three issues.

### 1. Sprint Merger

The 2000 Registration Statement did not discuss the May 18 decision by officials in the antitrust division of the Department of Justice to recommend against approval of the merger or the impact that a failure to merge would have on WorldCom. The 2000 Registration Statement did disclose that "the merger is subject to the receipt of consents and approvals from various government entities, which may jeopardize or delay completion of the merger." The Underwriter Defendants argue that they had no duty to handicap the chances that the merger would be approved, and that many articles on May 18 discussed the antitrust decision and the likelihood that it would be reversed or upheld.

A duty to disclose exists "when disclosure is necessary to make prior statements not misleading." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir.1993) (citation omitted). Once a potential merger is disclosed by an issuer, there is a duty to "update opinions and projections ... if the original opinions or projections have become misleading as the result of intervening events." *Id.* at 267.

Moreover, cautionary language within a registration statement indicating that a merger is subject to certain conditions does not necessarily mean that an underwriter has satisfied its disclosure duties. A defendant may not be liable for misrepresentations in a registration statement if they were "sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security." *P. Stolz Family P'ship, L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir.2004); *see also Halperin*, 295 F.3d at 357. Yet "the misrepresentation of present or historical facts cannot be cured by cautionary language." *Daum*, 355 F.3d at 96–97. The type of cautionary language that gives shelter to Section 11 and 12(a)(2) defendants is that

> aimed at warning investors that bad things may come to pass—in dealing with the contingent or unforeseen future. Historical or present fact—knowledge within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.

*Id.* at 97. "When objectively verifiable factors cause a significant change in a party's attitude toward a merger ... the securities laws may require that previously disclosed intentions be corrected." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712, 748 (S.D.N.Y.1989).

An underwriter can be relieved of a duty to disclose when certain developments affecting a corporation become "matters of general public knowledge." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978). As the Second Circuit stated in *Seibert*, "there is no duty to disclose information to one who reasonably should already be aware of it"; rather, "where information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose." *Id.* (citation omitted). In *Seibert*, for instance,

the Second Circuit granted summary judgment for the defendants, who were accused of violating Section 14(a) of the Exchange Act, on the grounds that "any reasonable shareholder who was not already familiar with [the allegedly omitted information] had this information readily available to him" in the form of a nationwide consumer boycott accompanied by "massive media advertising," pervasive press coverage, congressional debate, and administrative and judicial opinions. *Id.*

Nonetheless, the Second Circuit has more recently found that there are "serious limitations" on a Section 11 defendant's ability to "charge its stockholders with knowledge of information omitted from a . . . prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld,* 832 F.2d at 736. Moreover, sporadic press reports or reports published in other contexts may "not be considered to be part of the information that was reasonably available" to investors. *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199 (2d Cir.1993).

■■■ The Sprint merger was a principal focus of the 2000 Registration Statement, in particular the May 19 Prospectus Supplement,[55] which contained a pro forma consolidated financial statement for the post-merger company. Given that the announcement of the antitrust division posed a serious obstacle to obtaining the requisite regulatory approvals for the Sprint Merger, Lead Plaintiff may be able to show that the failure to describe those problems and their impact on WorldCom

was a material omission and that the boilerplate language in the Registration Statement warning investors that the merger was subject to regulatory approval was inadequate. While the May 18 decision may have been a matter of wide public knowledge, there is an issue of fact as to whether WorldCom's own failure to describe those problems and their impact on WorldCom was material.

### 2. *Conflicts of Interest*

The Underwriter Defendants contend that the amalgam of conflict of interest allegations omitted from the 2000 Registration Statement should be dismissed principally because there was no duty to disclose these facts. They point out that it is not illegal for banks to lend money, to underwrite bonds, to issue research reports, or to make a profit from doing each of these activities. They urge that it is a matter of opinion rather than fact as to whether their agreement to lend money to WorldCom or to Ebbers, their issuance of favorable analyst reports about WorldCom, or their decision to give WorldCom officers IPO shares [56] was behind their selection as underwriters. The Underwriter Defendants also point out that many of these industry practices were the subject of press reports.

The primary function of a registration statement is to disclose information about the issuer, not its underwriters. Indeed, the regulations governing the form and content of registration statements do not require many underwriter-specific disclo-

---

**55.** The Underwriter Defendants contend that the Prospectus Supplement was filed on May 12 and not May 19. They are wrong. There is a Prospectus that is dated May 12, 2000. This document is attached to the Prospectus Supplement dated May 19, 2000. On its first and last pages, the Prospectus Supplement

indicates that its date of filing is May 19, and that it includes the May 12 Prospectus.

**56.** The parties dispute whether the "spinning" of IPO shares to Ebbers and other WorldCom executives was publicly disclosed during the class period.

sures. Regulation S–K, for example, simply "requires an issuer to identify each underwriter with a material relationship with the issuer and the nature of the relationship, the underwriter's obligation to take securities, the underwriter's compensation, the existence of any underwriter's representatives on the issuer's board of directors, and any indemnity provided to the underwriter." *Degulis v. LXR Biotech., Inc.,* 928 F.Supp. 1301, 1314 (S.D.N.Y.1996); *see also* 17 C.F.R. § 229.508(a), (e), (f), (g). It is also worth noting that although Item 508(a) of Regulation S–K requires each underwriter with a material relationship with a "registrant" to "state the nature of the relationship," 17 C.F.R. § 229.508(a), the term "registrant" refers only to an issuer of securities and not to its employees, officers, or directors. *See, e.g.,* 17 C.F.R. § 230.100(a)(4) ("[a]s used in the rules and regulations prescribed in this part by the Securities and Exchange Commission pursuant to the Securities Act of 1933," *registrant means the* "issuer of securities for which a registration statement is filed" unless context requires otherwise).

While Regulation S–K requires disclosure of limited underwriter-related information, "no authority suggests that Regulation S–K is preemptive of the materiality requirement." *Degulis,* 928 F.Supp. at 1314. As stated previously, the regulations accompanying Section 11 include a catch-all provision, Rule 408, that requires registration statements to contain, "in addition to the information expressly required to be included in a registration statement ... such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408.

■■ Information regarding relationships that undermine the independence of an underwriter's judgment about the quality of the investment can be material to an investor. As a consequence, non-disclosure of an underwriter or issuer's conflicts of interest can constitute material omissions, even where no regulation expressly compels the disclosure of such conflicts. *SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 863 (S.D.N.Y.1997) (corporation paid money to brokerage firms in exchange for their cooperation in illegally liquidating unregistered stock); *SEC v. Scott,* 565 F.Supp. 1513, 1527 (S.D.N.Y.1983) (kickback agreement between the issuer and the underwriter), *aff'd sub nom, SEC v. Cayman Islands Reins. Corp.,* 734 F.2d 118 (2d Cir.1984). *See also Jenny v. Shearson, Hammill, & Co.,* No. 74 Civ. 3526, 1981 WL 1611, at *5 (S.D.N.Y. Mar.20, 1981) (brokerage's failure to disclose investment banking relationship with issuers).

■■ The Lead Plaintiff has presented sufficient information to raise questions of fact as to the adequacy of the disclosures in the 2000 Registration Statement concerning the relationship between certain of the underwriters, including the co-lead underwriters, and WorldCom. The jury will have to determine whether press reports about such topics as the spinning of IPO shares and bankers' dual roles as analysts and underwriters were sufficient to make it unnecessary to provide further disclosure within the Registration Statement. The jury will also have to determine whether the relationships between Ebbers and the bankers were so significant, given Ebbers' prominent position within the registrant and his power to affect their selection as underwriters for a bond offering, that a description of that relationship was material and required to be disclosed by

Rule 408.[57]

### 3. *Risk Factors*

■■■ The Lead Plaintiff contends that the 2000 Registration Statement was required by Item 503(c) of Regulation S–K to include a risk factors section that discussed WorldCom's ability to sustain its debt load, its reliance on borrowed money to fund its operations, its problems placing its commercial paper, its lack of positive cash-flow, and its underperforming stock.[58] The Underwriter Defendants contend that as an investment grade company, World-Com only had to describe in a risk factors section those "special circumstances" that had arisen since its last public filing and that the 2000 Registration Statement did so in its detailed discussion of the Sprint merger. They also assert that each of the risk factors identified by the Lead Plaintiff was in any event adequately disclosed, albeit not in a section denominated for risk factors.

Item 503(c) of Regulation S–K requires that a registration statement "must" include "where appropriate ... a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.508(c). With respect to the form and scope of a risk factors section, Item 503 directs that the risk factors discussion "be concise and organized logically. Do not present risks that could apply to any issuer or any offering. Explain how the risk affects the issuer or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk." *Id.* In addition, Item 503 provides some guidance as to the issues that merit discussion in a risk factors section, explaining that

The risk factors *may* include, among other things, the following:

(1) Your lack of an operating history;

(2) *Your lack of profitable operations in recent periods;*

(3) *Your financial position;*

(4) Your business or proposed business;

(5) The lack of a market for your common equity securities or securities convertible into or exercisable for common equity securities.

*Id.* (emphasis supplied.)

SEC guidance surrounding the content of Item 503 has been limited. For instance, in proposed rules released last month, the SEC briefly stated that a risk factors discussion under Item 503 is intended to "describe the most significant factors that may adversely affect the issuer's business, operations, industry or financial position, or its future financial performance." Securities Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Similarly, in providing guidance to

**57.** The Underwriter Defendants contend that any ruling that it is for the jury to decide whether it was a material omission to fail to disclose their economic entanglements with Ebbers will require disclosure in every underwriting of home mortgages, student loans, and checking and savings accounts. This very list underscores the difference between ordinary arrangements between employees and banks and the extraordinary financial relationships between the Underwriter Defendants and Ebbers. The Lead Plaintiff has presented sufficient evidence for a fact finder to conclude that Ebbers' arrangements with the Underwriter Defendants were of a magnitude and complexity to be both extraordinary and material to investors. Should the jury agree, such a decision should not be read as indicating that there is a duty to disclose an executive's ordinary banking arrangements and relationships.

**58.** This list is taken from the Lead Plaintiff's June 14, 2004 Supplemental Responses to Underwriter–Related Defendants' Second Set of Interrogatories. The list omits those items where the Lead Plaintiff did not respond to the arguments made by the Underwriter Defendants.

issuers as to what they should disclose regarding their readiness for Y2K issues, the SEC advised in 1998 that a discussion of risk factors must be "specific to the particular company and its operations, and should explain how the risk affects the company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risk may affect their investment." Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers, SEC Release No. 7558, 1998 WL 425894, at *14 (July 29, 1998).

When and if a prospectus must include a risk factor disclosure pursuant to Item 503 does not appear to have been discussed within the case law. Securities law commentators have noted that "even though the inclusion of a risk factors section in a prospectus filed under the 1933 Act is technically voluntary under Item 503(c) of Regulation S–K ... this inclusion has become widely accepted as a sound and prudent defensive measure in an era marked by class action lawsuits." 2 Alan R. Bromberg & Lewis D. Lowenfels, Bromberg & Lowenfels on Securities Fraud and Commodities Fraud § 5:280 (2d ed.2001). The SEC itself, however, has issued conflicting statements. While stating in 1983 that the disclosure of risk factors is "optional, at the discretion of the registrant," Registration Form Used by Open–End Management Investment Companies; Guidelines, SEC Release No. 6479, 1983 WL 35814, at *5 (Aug. 12, 1983), the SEC has suggested more recently that a risk factor discussion may be a necessity. Specifically, in 1998, the SEC proposed requiring risk factor disclosure in annual and quarterly reports filed pursuant to the Exchange Act and allowing reporting companies to incorporate risk factor disclosure into Securities Act registration statements. SEC Rel. 7606A, 63 Fed.Reg. at 67239. In so doing, it noted that

> [m]ost Securities Act registration statements currently *require* an analysis of the risks associated with an investment in a company's securities. Item 503 of Regulation S–K describes that *required* disclosure as a "discussion of the most significant factors that make the offering speculative or risky." The Commission promulgated this *requirement* because it assists investors in comprehending more fully whether the securities present an appropriate level of risk for them as an investment.

*Id.* (emphasis supplied); *see also* Form S–3, Registration Statement Under the Securities Act of 1933, Item 3 ("Furnish the information required by Item 503 of Regulation S–K.").

The Lead Plaintiff has identified a constellation of material omissions from the 2000 Registration Statement that concern the profitability of WorldCom's long-distance voice business and the impact that decreasing profit margins in that part of its business were having and would have on WorldCom's ability to compete, in particular on its ability to pour capital into its data services and Internet portal initiatives. While the Registration Statement discusses repeatedly and in many contexts the intense competition that WorldCom was facing, the Lead Plaintiff has shown that there is a question of fact as to whether it adequately disclosed even to a careful reader the alleged precarious state of WorldCom's profit margins in a major component of its business—the long-distance voice business—and the impact of that problem on its business as a whole,

including its ability to service its debt.[59] It has shown that similar questions of fact exist at least as to WorldCom's disclosures regarding the burden of its debt load.[60]

The Underwriter Defendants contend that public reports from rating agencies described the competition that WorldCom faced from other carriers in the long-distance market and that WorldCom's revenue from that line of business was declining. The Lead Plaintiff has shown that the issue of the condition of WorldCom's long-distance business was of sufficient importance to the overall economic health of WorldCom that a fact-finder could determine that it was appropriate under Item 503, as well as material to investors, to have a more complete description from WorldCom itself of the state of that business.

## B. *2001 Registration Statement*

The Lead Plaintiff has identified forty-two purported material omissions from the 2001 Registration Statement. They are, that the document:

1. Failed to disclose that WorldCom was improperly capitalizing line costs in violation of GAAP.

2. Failed to disclose that WorldCom had fraudulently under-reported its line costs in 2000 and the first quarter of 2001 by billions of dollars through the improper release of reserves.

3. Failed to disclose that WorldCom's business plan, in light of its failure to acquire Sprint, lacked a wireless strategy needed to compete effectively.

4. Failed to disclose adequately that the proliferation of new competitors in the voice long-distance business was having a negative impact on WorldCom's revenue and cash generation.

5. Failed to disclose that the World-Com Group's stated plan of focusing on high-growth data and Internet segments was almost entirely dependent on the Company's ability to stabilize cash flows through the MCI Group.

6. Failed to disclose adequately that WorldCom was experiencing continued difficulty with its MCI long-distance business segment.

7. Failed to disclose the extent to which consumer and wholesale long-distance revenue was declining and was expected to decline.

8. Failed to disclose adequately that certain of the proceeds of the offering would be used to fund the Company's negative free cash flow.

9. Failed to disclose that certain of the Underwriter Defendants extended credit

---

**59.** Among the passages in the 1999 Form 10–K and first quarter 2000 Form 10–Q on which the Underwriter Defendants rely as evidence of the adequacy of the disclosures in the 2000 Registration Statements are descriptions of increases in "voice revenues" that were partially offset by declines in "wholesale traffic" and federally mandated access charge reductions. They also point to descriptions in the 1999 Form 10–K of a number of factors that could impact WorldCom's ability to compete successfully in its data and Internet portal business and the statement that "[t]he success of MCI WorldCom will depend heavily upon its ability to provide high quality data communications services, including Internet con-

nectivity and value-added Internet services at competitive prices." The Form 10–K added that "the Company's pursuit of necessary technological advances may require substantial time and expense," and devoted an entire paragraph to an explanation of the necessity for significant capital expenditures to develop a competitive business.

**60.** Because the parties addressed so many issues in their papers, they did not address the remaining risk factor issues in sufficient detail to allow a reasonable assessment to be made as to them.

to WorldCom based on the promise of significant investment banking fees, planning immediately to reduce this exposure through transactions hidden from the Company and the investing public.

10. Failed to disclose that, while the Company intended to increase revenues by focusing on providing data services, this segment of WorldCom's business required large infusions of capital.

11. Failed to disclose that WorldCom's future performance was contingent upon the success of its data and IP initiatives.

12. Failed to disclose adequately the rapid rate at which WorldCom's debt leverage was rising and the effect this would have on the Company's liquidity.

13. Failed to disclose adequately the effect that the lack of a wireless. component was having on WorldCom's business.

14. Failed to disclose adequately the liquidity threat from continuing pricing pressures in long-haul transport, consumer long distance and other business segments.

15. Failed to disclose adequately that the slowdown in corporate telecom spending due to a weakening global economy was adversely affecting WorldCom's financial health.

16. Failed to disclose that WorldCom provided significantly less financial information regarding its business segments to the public than its competitors.

17. Failed to disclose that WorldCom had not had a permanent Treasurer for many months and that the newly appointed Treasurer lack relevant experience.

18. Failed to disclose that personnel assigned by the Underwriter Defendants to conduct due diligence on the Company were not able to form a view about what events or conditions were material to WorldCom.

19. Failed to disclose there were concerns among certain of the Underwriter Defendants that the Company would be downgraded by Moody's.

20. Failed to disclose concerns among certain of the Underwriter Defendants that WorldCom would be unable to maintain its credit ratings after assuming the debt from the May 2001 Offering as well as the debt from the acquisition of Intermedia.

21. Failed to disclose that certain of the Underwriter Defendants suffered from conflicts of interest that affected their ability to conduct a reasonable due diligence investigation....

22. Failed to disclose that. several of the Underwriter Defendants had, in the months immediately preceding the May 2001 Offering, internally downgraded the Company's credit rating in recognition of WorldCom's deteriorating financial condition, and other Underwriter Defendants had expressed significant concerns about the Company's creditworthiness.

23. Failed to disclose that WorldCom would be required to fund Digex's significant operating losses, which would have a material adverse effect on WorldCom's financial condition.

24. Failed to disclose that Intermedia was subject to a going concern letter from its auditor Ernst & Young.

25. Failed to disclose that the Company would need to expend significant amounts of cash to fund Intermedia as a going concern, despite the absence of any meaningful return on this investment of cash.

26. Failed to disclose that there was no sound business reason for WorldCom to acquire Digex.

27. Failed to disclose that the Intermedia acquisition was not properly considered

by WorldCom's Board of Directors prior to committing the Company to a purchase agreement.

28. Failed to disclose that WorldCom did inadequate due diligence on Intermedia before agreeing to purchase the company.

29. Failed to disclose the likelihood that the Company would not be able to sell the non-Digex assets of Intermedia, as required by the Department of Justice, for any material amount.

30. Failed to include a risk factor section, despite the fact that WorldCom's business was facing a number of significant risks.

31. Failed to disclose certain of the Underwriter Defendants' belief that WorldCom's institution of tracker stocks served no legitimate business purpose, and was done merely to attempt to disguise the deterioration in the business of WorldCom, Inc.

32. Failed to disclose the lack of any meaningful internal accounting controls at WorldCom.

33. Failed to disclose the lack of Board oversight at WorldCom, including the Board's failure to carefully consider large corporate transactions and its abdication of authority to Ebbers and Sullivan.

34. Failed to disclose the lack of meaningful debt planning by the Company or its advisors, including the lack of analysis to assess whether the Company could maintain the debt it incurred.

35. Failed to disclose that WorldCom's acquisition of SkyTel Communications had not been properly considered by WorldCom's Board and that it was not a sound business decision.

36. Failed to disclose that WorldCom's commercial paper credit rating prevented it from using commercial paper to fund its business plan and service its debt in the future.

37. Failed to disclose adequately the significant risk that WorldCom did not have the ability to service the debt it was assuming in the May 2001 Offering.

38. Failed to disclose that Ebbers was encumbered with a staggering amount of personal debt—much of which was extended by certain of the Underwriter Defendants and their affiliates and much of which was guaranteed by Ebbers' World-Com shares—such that he faced personal financial ruin if the price of WorldCom stock dropped.

39. Failed to disclose the numerous outside business ventures in which Ebbers was involved, in addition to what was supposed to be his full-time job as World-Com's CEO, and that he would undoubtedly be distracted by the demands of running these businesses.

40. Failed to disclose that certain Underwriter Defendants were concerned about Ebbers' long-term objectives and the depth of senior management on World-Com's future financial health.

41. Failed to disclose that the Underwriter Defendants did not conduct an adequate investigation into Ebbers' ability to repay his personal loans, much of which was guaranteed by WorldCom.

42. Failed to disclose that the audit committee of WorldCom's Board of Directors was not actively involved in discharging its duty to oversee the auditing of the Company's financial statements.

The Underwriter Defendants have moved for summary judgment with respect to each of these alleged omissions. The Lead Plaintiff argues in response that the 2001 Registration Statement should have included discussions of the Underwriter Defendants' conflicted relationship with

WorldCom and Ebbers, their decision to downgrade WorldCom as a credit risk and to hedge their own financial exposure to WorldCom, WorldCom's intent to use the proceeds of the offering to fund negative cash flow, and WorldCom's cash flow needs and ability to service its debt, as well as a risk factor section.[61]

For reasons similar to those discussed in connection with the 2000 Registration Statement, the motion for summary judgment on the claims based on the conflicts of interest, and WorldCom's cash flow and debt problems are denied. Because the Lead Plaintiff has not responded sufficiently to the arguments made by the Underwriter Defendants, or for the reasons explained herein, the Underwriter Defendants' motion is granted for listed omissions 8, 16–20, 22–29, 31–33, 35, and 39–42. The motion is granted as to the omission of any disclosure that the Underwriter Defendants had internally downgraded WorldCom as a credit risk, and the omission from the use of proceeds section of the Registration Statement.

### 1. *Downgrading WorldCom as a Credit Risk*

■ In February 2001, several of the Underwriter Defendants internally downgraded their credit ratings for WorldCom and some of them took steps to minimize or hedge their own exposure stemming from their participation in WorldCom credit facilities. While the Underwriter Defendants did not publicly disclose their ratings during this same period S & P publicly downgraded its credit rating for WorldCom.

The SEC regulations do not include, in their lengthy and detailed description of facts to be disclosed in a registration statement, any requirement to disclose an underwriter's internal credit ratings for the issuer or an underwriter's management of its own exposure on loans to an issuer. *See* Schedule A to Section 7(a) of the Securities Act, 15 U.S.C. §§ 77g(a), 77aa, and Reg. S–K, 17 C.F.R. § 229.10, *et seq.* The limited disclosures that the regulations do require regarding an underwriter have already been described.

Regulation S–K permits the disclosure of an issuer's credit ratings but does not compel it. The SEC initially discouraged the disclosure of credit ratings publicly reported by credit agencies since the "rating represents the subjective opinion of the rating organization that cannot be verified or even explained by the issuer of the securities." Disclosure of Security Ratings in Registration Statements, SEC Release No. 6336, 1981 WL 30768, at *3 (Aug. 6, 1981) ("SEC Rel. 6336"). In 1981, however, the SEC revised its policy to "permit[ ] registrants to disclose, on a *voluntary basis,* ratings assigned by rating organizations to classes of debt securities . . . in registration statements and periodic reports." 17 C.F.R. § 229.10(c) (emphasis supplied). In so doing, the SEC noted the "significance and usefulness" of ratings to investors, market professionals, and regu-

---

**61.** Although the Lead Plaintiff also refers to the problems that plagued the Intermedia acquisition, it does not respond to the detailed arguments made by the Underwriter Defendants outlining the disclosures about those problems in, *inter alia,* Intermedia's and WorldCom's public filings, including World-Com's May 9, 2001 Form S–4 filed in connection with that merger. Similarly, although the Lead Plaintiff refers to the fact that the creation of the tracker stocks had no legitimate business purpose, it does not respond to the Underwriter Defendants' recitation of the extensive disclosures about these stocks and WorldCom's concomitant realignment of its business units. The Underwriter Defendants have shown that, given the extensive disclosures by WorldCom, they are entitled to summary judgment on the omissions relating to Intermedia and the tracker stocks.

latory bodies alike. SEC Rel. 6336, 1981 WL 30768, at *3. The SEC further emphasized that by enabling registrants to include security ratings assigned to a class of debt securities in a registration statement, it was not imposing "a mandatory rule in this area nor ... indicating that issuers should disclose security ratings." *Id.* at *4.

The Underwriter Defendants had no obligation to disclose in the WorldCom Registration Statement information about their own internal credit ratings for WorldCom or their own hedging strategies for WorldCom debt that they held. These facts were unknown to WorldCom, and the Lead Plaintiff has not shown that the registration process requires disclosure of such facts.

This does not mean, however, that the Underwriter Defendants' internal credit ratings and hedging strategies are irrelevant to the issues to be tried. An underwriter's perception of the nature of the risks faced by a WorldCom creditor is some evidence of the existence of such risks, and thus reflects on the quality of disclosures that an underwriter was required to ensure were made through a registration statement.[62] Even if these internal downgrades and hedging activities need not be disclosed, the Lead Plaintiff has shown that they help to raise material issues of fact as to whether the 2001 Registration Statement adequately described the risk of investing in WorldCom.

### 2. Use of Proceeds

█ The Lead Plaintiff contends that it was a material omission not to disclose,

in the "use of proceeds" section of the 2001 Registration Statement, that the proceeds would be used to fund WorldCom's "negative cash flow." The Prospectus Supplement disclosed that the proceeds would be used for general corporate purposes, including "to repay commercial paper, which was used for general corporate purposes."

Item 504 of Regulation S–K requires a registration statement to disclose the *"principal purposes* for which the net proceeds to the registrant from the securities to be offered are intended to be used and the approximate amount intended to be used for each such purpose." 17 C.F.R. § 229.504 (emphasis supplied). While "[d]etails of proposed expenditures need not be given," the Instructions to Item 504 direct a registrant to consider "the need to include a discussion of certain matters addressed in the discussion and analysis of [the] registrant's financial condition." *Id.* Moreover, the Instructions explain that a registrant "may reserve the right to change the use of proceeds, provided that such reservation is due to certain contingencies that are discussed specifically and the alternatives to such use in that event are indicated." *Id.*

Last year, the Second Circuit affirmed the dismissal of a claim that a prospectus that stated that the proceeds would primarily be used as working capital for business expansion, including for "general corporate purposes," was false and misleading. *DeMaria,* 153 F.Supp.2d at 313. The issuer's "alleged use of the proceeds in part to repay [ ] losses does not constitute a misstatement because a function of working capital is to fund operations."

---

**62.** The Underwriter Defendants' internal credit ratings for WorldCom and their hedging activities are also relevant to the due diligence defense that the Underwriter Defendants intend to proffer at trial. While the Underwriter Defendants argue that it is al-

ways prudent to hedge one's investments, it will be a question of fact for the jury whether the hedging activity undertaken here was in the ordinary course or because of special concern over WorldCom's economic health.

*DeMaria,* 153 F.Supp.2d at 313. In contrast, an issuer's declaration in a prospectus that a portion of the proceeds from a debt offering would be used to repay in full certain short-term bank borrowings was actionable when substantially all of the proceeds were used for this purpose. *Beecher v. Able,* 374 F.Supp. 341, 355 (S.D.N.Y.1974).

The disclosure that the proceeds would be used for "general corporate purposes" was broad enough to include the funding of negative cash flow. There is no misrepresentation about the use of proceeds, and Item 504 does not require disclosure of details. Whether the Registration Statement otherwise adequately disclosed material information about WorldCom's cash flow is more appropriately addressed in the context of its omission of a risk factors section.

3. *Risk Factors*

The Lead Plaintiff asserts that Item 503(c) of Regulation S–K required the 2001 Registration Statement to include a risk factors section that discussed WorldCom's ability to satisfy its debt burden and its lack of planning in that regard, the fact that it was not cash-flow positive, the problems it was experiencing placing its commercial paper, WorldCom's renegotiation of its credit facilities, and the fall in WorldCom's stock price.[63] The Underwriter Defendants rely on their argument that it is unnecessary to include a risk factors section in the Registration Statement unless there are "special circumstances" and that none existed here.

This prong of the Lead Plaintiff's case rests on its overarching argument that the 2001 Registration Statement did not adequately describe critical financial information about WorldCom that any reasonable investor would have wanted to have and that should have been included in the Registration Statement in a complete and accessible manner. Whether, when read as a whole, the 2001 Registration Statement adequately described WorldCom's financial position and the risks attendant to a purchase of WorldCom bonds is a question for the jury. In the event that the 2001 Registration Statement did adequately describe the risks, albeit not in a section labeled "risk factors," that description would ameliorate if not eliminate any argument that the failure to include the description a section labeled "risk factors" was material. The Lead Plaintiff has shown that there are questions of fact as to whether material information regarding WorldCom's financial condition was omitted from the 2001 Registration Statement, and as to whether that omitted information was of the kind that should have been highlighted by including it in a section labeled "risk factors."

**Conclusion**

The motion by the Securities Industry Association and the Bond Market Association to appear as *amici curiae* is granted.

For the reasons stated herein, the parties' motions for summary judgment are each granted in part and denied in part.

The Lead Plaintiff's motion is granted as to WorldCom's 2001 Registration Statement insofar as it reported line costs

---

**63.** This list of omitted risk factors is taken from the Lead Plaintiff's Supplemental Responses to the Underwriter–Related Defendants' Second Set of Interrogatories. The list omits certain items which are not discussed in the Lead Plaintiff's opposition to summary judgment. It also omits the fact that several of the senior underwriters had recently lowered their internal credit ratings for World-Com. For reasons already discussed, there was no duty to disclose this last fact.

in WorldCom's first quarter financial statement for 2001. The Underwriter Defendants' motion is granted as to listed omissions 12–18 and 20 for the 2000 Registration Statement, and 8, 16–20, 22–29, 31–33, 35, and 39–42 for the 2001 Registration Statement.

SO ORDERED: